The **KICKAPOO TRIBE OF KANSAS,** the Kickapoo Tribe of Oklahoma et al.

v.

The **UNITED STATES.**
No. 13–65.

United States Court of Claims.
Feb. 17, 1967.

Louis L. Rochmes, Washington, D. C., for appellant; Allan Hull, Cleveland, Ohio, attorney of record.

W. Braxton Miller, Washington, D. C., with whom was Asst. Atty. Gen. Edwin L. Weisl, Jr., for appellee and cross-appellant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COL-LINS, SKELTON, and NICHOLS, Judges.

## OPINION

COLLINS, Judge.

This case comes to us on cross-appeals from an interlocutory determination of the Indian Claims Commission (hereinafter the "Commission"). The matter in dispute concerns the Commission's allowance of certain offsets against an earlier interlocutory judgment in favor of the appellants, petitioners below. (Hereinafter appellants shall be referred to as "petitioners" and the appellee and cross-appellant as "respondent.") The claim relates to the following:

By the Treaty of May 18, 1854,[1] the Kickapoo Tribe of Indians agreed to sell to the United States a portion of the reservation lands which they then occupied. For these lands (located in the present State of Kansas), the United States agreed to pay $300,000, a sum which the Commission has found to have been unconscionable.[2] The Commission has determined that the fair value of this land at time of purchase was $1,236,000, thus leaving a balance payable to the Kickapoos of $936,000. From this amount, the Commission has permitted Government offsets of $120,252.93. It is this latter figure—the correctness of which is challenged by both parties—which alone is the matter that we have been requested to review.

Between the years 1840 and 1864, a number of Kickapoo Indians left their Kansas reservation and became domiciled in Mexico, remaining there with the consent of the Mexican Government. Complaints were received that these "Mexican Kickapoos" were responsible for raids in the western part of Texas and, because of the potential problems to which such border incidents might lead, the United States undertook to secure their return. After several unsuccessful ventures, Government agents succeeded in inducing about 300 of the "Mexican Kicka-

---

1. 10 Stat. 1078.

2. 10 Ind.Cl.Comm. 320, 332 (1962).

poos" to remove to the Indian Territory, an area located in the present State of Oklahoma. These Indians settled on the north fork of the Canadian River in the early autumn of 1874, a territory hereinafter referred to as the "Oklahoma reservation." In 1875, a further exodus brought 114 more of the Mexican Kickapoos back to the United States. However, this group returned to the old Kansas reservation rather than to the new Oklahoma reservation. The offsets in issue relate to governmental expenditures made in behalf of both groups—those Kickapoos who settled in Oklahoma (hereinafter the "Oklahoma Kickapoos") and those Kickapoos who either remained or resettled on the Kansas reservation (hereinafter the "Kansas Kickapoos").

Of principal concern to us is the authority from which the Government's offset rights derive. The controlling statute, set forth in 25 U.S.C. § 70a (1964),[3] states, in relevant part, the following:

> In determining the quantum of relief the Commission shall make appropriate deductions for all payments made by the United States on the claim, and for all other offsets, counterclaims, and demands that would be allowable in a suit brought in the Court of Claims under section 250 of Title 28; the Commission may also inquire into and consider all money or property given to or funds expended gratuitously for the benefit of the claimant and if it finds that the nature of the claim and the entire course of dealings and accounts between the United States and the claimant in good conscience warrants such action, may set off all or part of such expenditures against any award made to the claimant, except that it is declared to be the policy of Congress that monies spent for the removal of the claimant from one place to another at the request of the United States, or for agency or other administrative, educational, health or highway purposes, or for expenditures made prior to the date of the law, treaty or Executive Order under which

the claim arose, * * * shall not be a proper offset against any award.

Since the offsets in this case are neither related to the claim in chief (i. e., the Kansas land sale effectuated through the treaty of 1854), nor otherwise allowable under the provisions of former section 250 of title 28, their legitimacy must rest solely upon that clause of the statute which relates to "funds expended gratuitously for the benefit of the claimant." As to such gratuitous expenditures, their allowance as offsets is predicated upon the Commission's reviewing "the nature of the claim and the entire course of dealings and accounts between the United States and the claimant" and deciding, in light of such a review, whether (a) the expenditure is in fact a gratuity and (b) whether "in good conscience" its allowance as an offset is warranted.

The "Oklahoma offsets"—with which we deal first—comprehend two basic elements, namely, the land value of the Oklahoma reservation and the sums expended over a period of years for the subsistence of the Kickapoos on this reservation. The Commission recognized an offset right in both of these categories. The petitioners take issue; they rely upon a threefold argument.

Their first and principal contention is that the expenditures in issue were not gratuitous in nature. Instead, it is alleged that they were part and parcel of the contractual undertaking the Government assumed under the agreement which led the Kickapoos to relinquish their Mexican abode to return to the United States. Petitioners argue that the return of the Kickapoos to their native land establishes, under accepted principles of contract law, adequate consideration to support the reciprocal obligations assumed by the Government— namely, providing the Indians with land and subsistence. Inasmuch as the United States may here, by statutory proscription, only claim an offset when the expenditure is deemed gratuitous, petitioners allege that no offset right exists

3. Chapter 959, § 2, 60 Stat. 1040, 1050 (1946).

because the expenditures were part of the Government's contractual undertaking. Secondly, and as an alternative argument, it is asserted that, as to the expenditures made subsequent to 1893, these constituted benefits flowing only to individual members of the tribe rather than benefits to the tribe as a whole and for this reason were improperly allowed. Finally, it is contended that the Commission erred in deciding that the course of dealings between the parties justified the allowance of offsets. On this latter point, petitioners contend that the Commission transgressed its statutory authority in that it treated the matter of the Government's right to offsets as though mandated by statute rather than resting within the permissive discretion of the Commission itself.

By way of rejoinder, respondent endorses in general the Commission's basic conclusion that the value of the Oklahoma reservation, as well as the subsistence expenditures, constituted an allowable gratuitous offset. However, respondent voices disagreement with respect to two facets of the Commission's order. The first of these relates to the Commission's conclusion as to the proper date for determining the value of the Oklahoma reservation. The Commission's valuation date was fixed as of October 1, 1874—this being the year in which the Kickapoos took possession of the land in Oklahoma. Respondent contends that, prior to 1893, the Kickapoos had neither right, nor title, nor claim to the Oklahoma land, and that it was not until the Act of March 3, 1893, that title, in severalty, was granted to them.[4] Since the "permissive occupancy" which the Kickapoos enjoyed prior to 1893 allegedly bestowed upon them no vested rights in the land, respondent argues that the value of the gratuity

could not be ascertained until the Kickapoos received title. Hence 1893, rather than 1874, is claimed as the proper valuation date.

The second point of objection relates to the Commission's disallowance of certain transportation charges. However, since these relate to the Government's "Kansas expenditures," this matter will be discussed infra.

As to the matter of chief concern here, i. e., the correctness of treating the value of the Oklahoma reservation as a proper item of offset, we are in accord with the Commission's basic premise that the expenditure constituted a gratuity. However, we are not in accord, either with the Commission's or with the respondent's position, as to the correct valuation date.

Our endorsement of the Commission's position treating the value of the Oklahoma reservation as an offsetable gratuity is predicated on a consideration which the petitioners ignore. The Kickapoos' claim-in-chief rests upon the Treaty of May 18, 1854. The terms of this treaty, as already noted, provided for the sale to the United States of part of the Kickapoos' Kansas reservation for a total sum of $300,000, an amount now to be increased by virtue of the Commission's determination. Relevant to our present problem are the reciprocal obligations which the Kickapoos accepted under this same treaty. The Kickapoo Tribe covenanted to accept as its permanent home 150,000 acres of land, same to be located within the limits of the reservation then occupied in Kansas, or an equivalent acreage, of its own choosing, in otherwise unappropriated United States lands. Should the Kickapoos have elected the latter, all rights to the remaining Kansas lands would have been

4. The Act of March 3, 1893, ch. 203, 27 Stat. 557, which ratified a proposed agreement of September 9, 1891, provided for the cession, to the United States, of any and all legal interest which the Kickapoos might have in the Oklahoma reservation. In consideration for this cession, the United States gave to each Indian the right to select 80 acres of land, this to be held and owned in severalty, with the United States retaining a 25-year trust for the benefit of the allottees. In addition, the United States obligated itself to appropriate $64,650, this to aid the Indians in improving their allotments.

relinquished to the United States. (10 Stat. 1079, article I.) The tribe chose to remain in Kansas. In addition to this commitment regarding their homesite, the Kickapoos also pledged to cease from acts of depredation against both Indians and citizens. These covenants were broken when the Kickapoos forsook their Kansas home and began to commit the border raids which, as previously recited, led the United States to bargain anew with them.

■ If the United States is now to be held to account for the obligations which it assumed under the 1854 treaty (as indeed we think it should), then it seems equally valid and equitable to impose upon the Kickapoos a similar burden. And thus it would follow that the Kickapoos were not free (at least contractually so) to abandon the Kansas reservation they had initially bargained to accept in 1854. Hence, the Kickapoos did not, upon relinquishing their Mexican domicile, furnish what they now claim as the quid pro quo for the promises made them by the United States. Their treaty promises— to accept as a permanent home the lands in Kansas and to cease from all acts of depredation—placed them under a preexisting legal obligation; their return to the United States established no new consideration, but simply honored what had already been promised. The United States was under no legal obligation to grant a new reservation and the fact that it did so, as an inducement to secure the Kickapoos' return, does not, under the present facts, alter its character as a gratuity. The grant of the Oklahoma reservation was a proper offset. See Peoria Tribe of Indians of Okla. v. United States, 169 Ct.Cl. 1009 (1965).

As to the correct valuation date for the reservation, this we believe should be fixed in accordance with the land value established at time of original purchase by the United States in 1866, i. e., 30 cents per acre.[5]

The Government contends that the value of the Oklahoma lands must be measured as of the time the Kickapoos received title, i. e., 1893. Presumably, under this line of reasoning, were the Kickapoos never to receive title or could the Government offer no title as proof of its expenditure, then the offset would be impermissible. Yet, we have clearly held otherwise.

In Red Lake, Pembina & White Earth Bands v. United States, 164 Ct.Cl. 389, 398 (1964), it was declared that an offset allowance rested not upon the Government's furnishing a muniment of title, but rather upon its offering adequate proof of an expenditure. Here, as in Red Lake, supra, the controlling principle that we recognize in assessing the correctness of a claimed offset is whether the United States has satisfactorily shown a gratuitous expenditure conferring a tribal benefit. An affirmative response to that question does not require that the tribal benefit thus bestowed bear every indicia of a perfected gift. In short, the matter of title to the Oklahoma reservation is irrelevant.[6]

The Kickapoos came to the Oklahoma lands under express congressional directive, and hence the only question here is whether the lands thus furnished them should be evaluated—for offset purposes —as of the date of purchase (1866) or as of the date the Indians took possession (1874).

■ Were we to adhere to the latter, then the subsequent enhancement of the lands' value would add to the offset right a new dimension—namely, a profit. Such a result would not be entirely without support, for the offset provisions (25 U.S.C. § 70a) do speak in terms of "all money or property given." (Emphasis supplied.) Nevertheless, under the spe-

5. The Oklahoma reservation was part of an area ceded to the United States by the Creek Nation in 1866 "in compliance with the desire of the United States to locate other Indians and freedmen thereon * * *." 14 Stat. 785, 786. For this purchase, the United States paid 30 cents per acre.

6. Whether the Indians may in fact have obtained a title interest prior to 1893 is a matter we do not decide.

cial circumstances of this case, we feel that the offset should reflect no more than actual expenditure, i. e., 30 cents an acre. We are persuaded to this end because the lands in issue were purchased for the very purpose to which they were ultimately put, that is, "the desire of the United States to locate other Indians and freedmen thereon." 14 Stat. 785, 786. And where, as here, there exists such a close relationship, both in time and in purpose, between the reason for the expenditure (to settle Indians upon the land) and the fulfillment of that end (the Kickapoos took possession in 1874), we deem it more consistent with equitable considerations and the spirit of the Indian Claims Commission Act to limit this offset to the sums actually expended by the Government.

The second item in issue concerns the subsistence expenditures authorized by Congress for the Oklahoma Kickapoos. These expenditures, which span the years 1881 through 1920, involve a total sum of $169,848.23. Before the Commission, the Government claimed reimbursement to $99,646.71; the Commission allowed $73,-729.44, rejecting the balance as unallowable administrative, agency, and transportation expenses. The petitioners now contend that, as to that portion of the $73,729.44 which represents expenditures made subsequent to 1893, the Commission was in error in permitting its offset. As to these post-1893 expenditures, petitioners contend that their inclusion was erroneous because they allegedly did not represent tribal benefits, but rather individual benefits. If correct as to this contention, then petitioners gain the point, for the distinction between tribal versus individual benefits is one we have long recognized. United States v. Kiowa, Comanche & Apache Tribes of Indians, 166 F.Supp. 939, 943, 143 Ct.Cl. 545, 550 (1958), cert. denied, 359 U.S. 934, 79 S.Ct. 650, 3 L.Ed.2d 636 (1959).

The relevance of the year 1893 is to be found in the fact that it was at this time that the Kickapoos, as a tribe, ceded all claim, title, and interest in their Oklahoma reservation to the United States, receiving in return allotments in severalty. (See footnote 4, supra.) As we now understand petitioners' argument, their contention that post-1893 expenditures conferred only individual benefits is based largely upon the fact that many of the Kickapoos opposed, on religious grounds, the transition from communal ownership to individual ownership of the land. Resistance to the new way of life, on the part of some of the Kickapoos (known as the "kicking Kickapoos"), brought with it a declining economic situation, and this in turn required the United States to advance considerable sums for their support. We are now asked to eliminate these post-1893 expenditures not only because they were directed to individuals rather than to the tribe, but because their necessity was incurred in the first instance by a program which the Indians opposed.

That faction of the Kickapoo Tribe which resisted the lands-in-severalty allocation (i. e., the kicking Kickapoos) constituted a sizable number—reported by one agent as representing more than two-thirds of the entire tribe.[7] This, on the face of it, is sufficient to negate petitioners' contention that the expenditures were not for the benefit of the tribe. Yet the claim may be supportable on another footing.

The system of individual land tenure, to which the Kickapoos acceded, was a matter of policy endorsed far more strongly by its governmental advocates than by its Indian beneficiaries. That the Kickapoos did not desire individual land ownership is manifest. The Act of March 3, 1893,[8] which act provided for the cession to the United States of the Oklahoma lands and their return to the Indians in severalty, contains the following (27 Stat. at 561):

The Kickapoo tribe of Indians having agreed upon terms of sale of their

7. 1899 Report of Commissioner of Indian Affairs, pp. 291, 292.

8. Chapter 203, 27 Stat. 557.

reservation with the commissioners for the United States, except the commissioners insist on the Indians taking lands in allotment, while the Indians insist on taking an equal amount of land as a diminished reservation, the title to be held in common, and having further agreed to abide by the decision of the Secretary of the Interior in the premises, and that said lands shall be taken in common or in allotment as he shall direct, and that a contract shall be signed as he may determine:

\*   \*   \*   \*   \*   \*

Now, I. John W. Noble, Secretary of the Interior, and as said Secretary, do hereby decide that the Kickapoo Indians take their lands in allotment and not to be held in common, and I so direct.

Let the contract, so far as the question submitted is involved, be signed in accordance with this decision.

Done this ninth day of September, A.D. eighteen hundred and ninety one.

Similar expressions of disapproval regarding the system of land distribution are also to be found in other parts of the treaty. (See 27 Stat. 560.) [9]

■ The right to an offset presupposes not only a governmental expenditure, but one from which the United States receives no benefit in return. Peoria Tribe of Indians of Okla. v. United States, supra. That is not entirely the case here. The United States actively promoted its severalty program and specifically agreed to pay to the Kickapoos "as \* \* \* further consideration \* \* for the cession \* \* \* for the improvement of their said allotments, and for other purposes for their benefit, the sum of sixty-four thousand and six hundred and fifty ($64,650) dollars \* \* \*." (Article V, 27 Stat. 558, 559.) Whether the Commission gave consideration to the Government's contractual promise to ren-

der financial support to the Kickapoos is a fact we have been unable to determine from the record. In addition, petitioners argue strongly that, but for the allotments in severalty, the Kickapoos would have managed well and further subsistence would either not have been necessary or else would have been greatly reduced.

■■ There seems to be support for this contention in several contemporaneous reports of Indian agents which apparently were not introduced before the Commission below. In the interest of justice, we think the case should be remanded so that the petitioners can now attempt to show, either through the reports of these Indian agents which have been brought to our attention or through other evidence, that the course of dealings between the United States and the Indians, with respect to the allotment-in-severalty program, was such as to call for disallowance of this offset, in whole or in part. We would further point out that if any part of the Government's present offset demands relates to the $64,650 which it specifically agreed to pay under article V of the 1893 treaty, then such demand must be rejected. Sums clearly specified under treaty language as "consideration" are not gratuitous expenditures.

Turning now to the Government's "Kansas expenditures," the Commission's treatment of same is challenged by both parties, each raising objection on separate issues. As previously recited, the Government takes issue with the Commission's disallowance, as an offset, of the transportation costs incurred by the United States in connection with its treaty obligations with the Kansas Kickapoos. For their part, petitioners challenge the propriety of offsetting the sums involved in certain land purchases consummated between 1939 and 1941, again involving the Kansas Kickapoos.

---

9. We have given consideration to the fact that, under the Act of March 3, 1893, the Kickapoos agreed to rest the matter of land distribution in executive discretion, but this fact does not dissipate the more overriding consideration namely, that it was the United States which promoted the lands-in-severalty program in face of strong Kickapoo dissent.

As to the first of these, i. e., the transportation charges, they pertain to the following: By the Treaty of May 18, 1854, the Kickapoo Indians agreed to sell to the United States a portion of their Kansas reservation. By the Treaty of June 28, 1862,[10] the reservation was further reduced in that this treaty gave the Atchison and Pike's Peak Railroad Company an option to purchase some of the land and also authorized the distribution of reservation lands in severalty among those who desired it. The funds which each of these treaties yielded were used, in part, by the Kickapoos to purchase various items of supply. It is the cost of delivering these purchases which the respondent would now have us treat as governmental gratuities. The Commission declined to do so on the theory that, under the aforementioned treaties, the United States had an implied obligation to pay transportation charges on supplies purchased from treaty funds. We construe these treaties otherwise.

■■ Judicial espousal of liberality in the reading of Indian treaties, e. g., United States v. Shoshone Tribe of Indians, 304 U.S. 111, 116, 58 S.Ct. 794, 82 L.Ed. 1213 (1938), cannot be used as a guise under which to expand the Government's clearly assumed and clearly limited obligations, Confederated Bands of Ute Indians v. United States, 330 U.S. 169, 179, 67 S.Ct. 650, 91 L.Ed. 823 (1947). There is nothing in the treaty articles relied upon by the Commission (article 2 of the 1854 treaty and articles 5 and 11 of the 1862 treaty), nor in the circumstances of the parties' dealings as a whole, to suggest that the United States either undertook to pay the charges in question or that the Kickapoos might so have understood. On the contrary, each treaty details the sum due the Kickapoos and the manner of its payment. The treaty of 1862 distinctly itemizes which expenses the United States shall bear. Neither treaty places the cost of necessary supplies on other than the Indians themselves. If inference must supply an answer as to who shall bear the costs of transporting those supplies, then analysis directs us to choose the Indians. While the sum involved is small (approximately $600), the principle is not. The Kickapoos were to shoulder the cost of their purchases and that, fairly construed, comprehends the cost of delivery. Where the converse obtains and the Government bears the expenditure in chief, then it must pay the transportation charges. See Quapaw Tribe of Indians v. United States, 120 F.Supp. 283, 128 Ct.Cl. 45, 67 (1954).

The second of the "Kansas expenditures" upon which objection has been taken concerns a Government outlay of $44,000. This relates to a purchase, by the United States, of 966 acres of Kansas land for 25 homeless families. Title to this land was taken in trust for the Kickapoo Tribe of Indians of the Kickapoo Reservation in Kansas. Petitioners now press for removal of this expenditure from the catalog of permissible offsets by seeking to relate the homelessness of the particular Indian families (their homeless condition being the reason for the purchase) to the Government's earlier and allegedly premature lifting of the alienation restrictions imposed upon the Kansas Kickapoos at the time that their reservation lands were allotted to them in severalty.[11]

---

10. 13 Stat. 623.

11. As was the case with the Oklahoma Kickapoos, the Kansas Kickapoos were likewise made subject to the Government's lands-in-severalty policy. This policy found its first expression in the earlier cited 1862 treaty, which contained a provision allowing the Indians to choose between communal versus individual ownership. Thereafter, the severalty program was given formal declaration by Congress with the passage in 1887 of the General Allotment Act, ch. 119, § 1, 24 Stat. 388, and all Kansas reservation land still retained in common ownership was made subject to individual ownership. This act provided for the United States to "hold the land thus allotted, for the period of twenty-five years, in trust

■ As did the Commission, so do we also reject this claim. The causal relationship upon which the petitioners would build their argument is too tenuous to gain our support.

While the Secretary of the Interior may have erroneously authorized the issuance of fee patents contrary to the wishes of the allottees and therefore, ad arguendo, contrary to statutory authority,[12] the significant fact is that this allegedly erroneous action is in no wise shown to have later required correction through the land purchase which the petitioners now question. In other words, given the accepted fact that a majority of the Kickapoos did choose a voluntary termination of the Government's trusteeship over their individual land holdings (a factor which distinguishes them from their Oklahoma counterpart), it becomes, on the facts before us, equally reasonable to assume that the "homeless" Kickapoo was one who chose to own his land outright rather than one who might have objected to the Government's termination of its trusteeship. And if the former alternative obtained, then it would most certainly follow that the Government's aid (i. e., the land purchases) rescued the homeless Kickapoos from a condition they alone precipitated and was not one which the Government may have engendered. The land purchases under that set of facts would clearly be a gratuitous expenditure.

The claim also demands rejection on another ground. Petitioners indicate that policy patents (i. e., fee ownership) were issued to the Kickapoos some time prior to 1912. But the facts show that, during the period immediately following World War I, the Kickapoos were faring well economically and thus their state of destitution in later years strongly reinforces the Commission's conclusion that it was the intervening depression of the 1930's that brought about the state of homelessness and not the Government's erroneous actions of 1912. For the reasons stated, we affirm the Commission's determination that the United States may set off the expenditures borne out of its Kansas land purchases.

We are left then with the final consideration, namely, the petitioners' contention that the Commission erred in its overall treatment of the Government's offset right.

This claim, as we have previously pointed out, derives its force from the statutory requirement that compels the Commission to look to "the entire course of dealings and accounts between the United States and the claimant," and, in that light, deciding whether "in good conscience" a gratuitous expenditure may be offset.[13] Petitioners contend that the Commission's failure to have made affirmative findings on the "course of dealings" implicitly acknowledges that the Commission abandoned its discretionary power over offset allowances and thereby transformed the Government's offset right from one depending upon equitable considerations into one resting solely

---

for the sole use and benefit of the Indian to whom such allotment shall have been made, * * *." Ch. 119, § 5, 24 Stat. 389.

12. The reference here is to the Act of May 8, 1906, ch. 2348, § 6, 34 Stat. 182, 183, which amended the General Allotment Act of 1887, ch. 119, 24 Stat. 388. Among its provisions, and relevant to petitioners' argument, is that clause of the amending act which states:

"* * * the Secretary of the Interior may, in his discretion, and he is hereby authorized, whenever he shall be satisfied that any Indian allottee is competent and capable of managing his or her affairs at any time to cause to be issued to such allottee a patent in fee simple, and thereafter all restrictions as to sale, incumbrance, or taxation of said land shall be removed * * *."

Petitioners' contention is that the Secretary of the Interior should have given heed to the Kickapoos' inability to manage their business affairs intelligently and that a loss of their lands would have been a predictable outcome.

13. Chapter 959, § 2, 60 Stat. 1050 (1946); 25 U.S.C. § 70a (1964).

upon proof of expenditure. Similar contentions were advanced and rejected in Red Lake, Pembina & White Earth Bands v. United States, supra. We reaffirm the position there taken.

▇▇▇ To set out, by way of affirmative findings, a historical relation spanning more than a century would not only be a herculean task, but would, in the last analysis, offer little aid in resolving the question of whether a course of dealings justified the present recovery of a prior governmental expenditure. Judged strictly in terms of abstract moral principles, much more is owed the American Indian than the simple legal right to collect today what honorable dealings should have bestowed long ago. But that consideration alone cannot be invoked to give *legal* substance to the "course of dealings" clause. This requires definition within narrower limits and this is what the Commission has done. Thus, where a governmental expenditure confers no benefit upon the Indians as a tribe, or where it is designed solely to further governmental ends, or occurs in the context of a contractual exchange, no gratuitous offset right exists, for here, by judicial definition, no "gratuity" can be found. The Commission, subject to the corrections we have noted, has adhered to these standards, and its judgment is affirmed.

By way of summary, we set forth the following: With respect to land purchases, the United States is entitled to set off the value of the Oklahoma reservation, this to be measured in terms of original purchase price of 30 cents per acre. It is similarly entitled to set off the sums expended for the Kansas land purchase. As an additional offset, it may claim the costs incurred in transporting to the Kickapoos those items of supply which the Kickapoos were to purchase from their treaty funds. As to the subsistence expenditures which arose after 1893, we have noted that there exists support linking the necessity for these expenditures to the Government's undue insistence upon its lands-in-severalty policy. The Commission is to reassess these expenditures and if, after a further hearing, examination bears out the point that the expenditures were necessary because of improper economic disruption which the severalty program may have occasioned, then the expenditures should be disallowed. Additionally, we pointed out that, under its 1893 treaty with the Oklahoma Kickapoos, the Government committed itself, contractually to pay over the sum of $64,650. To the extent that the Government's present offset demands may seek to recover any part of this sum, same is to be disallowed.

The determination of the Indian Claims Commission is affirmed in part, reversed or vacated in part, and remanded for further proceedings consistent with this opinion.

Affirmed in part, reversed or vacated in part, and remanded.