Cowen, Ohief Judge,
delivered the opinion of the court:
This is an appeal from an interlocutory order entered on *677 July 26,1966, by the Indian Claims Commission. Appellants, The Ponca Tribe of Indians of Oklahoma and three individuals representing all members thereof,[1] brought suit before the Commission against the United States, appellee, to recover just compensation for the taking of their Nebraska reservation in 1877. In response to two questions submitted by the parties for a preliminary determination, the Commission concluded, Commissioner Scott dissenting, that, in the event the appellants were successful on their claim, the United States would be allowed to offset the claim by (1) applying as payment on that claim the fair market value of a 101,894.31-acre reservation granted to the Poncas in Indian Territory some years after their removal from the Nebraska reservation, and (2) by reducing the total acreage on which recovery is sought by the 27,235.90 acres of land which were subsequently allotted to individual tribal members who had remained on or returned to the Nebraska reservation.
Appellants would have us reverse the Commission and find that the purchase of the Indian Territory land was a part of the Government’s cost of wrongful removal, and, at best, represented a gratuity of the kind ineligible for consideration as an offset and, further, that the allotments represented benefits to individuals alone and cannot be applied in reduction of a tribal claim. We agree with the appellants on the Allotment issue, but hold that the United States is entitled to credit for payment on the claim, but, in partial disagreement with the Commission, we limit that payment to $48,-389.46 — the purchase price the United States paid for the Indian Territory land.
The facts leading up to this litigation are here reported ■substantially as they were found by the Indian Claims Commission in its findings of fact and opinion which accompanied the order now under review. Those facts are as follows:
The principal claim asserted before the Indian Claims Commission by appellants was for compensation for the loss •of their Nebraska reservation which had been established under the provisions of the treaties of March 12, 1858, 12 *678 Stat. 997, and March 10, 1865, 14 Stat. 675. The contested taking took place when this reservation of some 96,000 acres was erroneously included in lands granted by the United States to the Sioux Indians under the Treaty of April 29, 1868, 15 Stat. 635. The Poncas were not parties to the 1868 treaty, nor were they at the time aware that the United States had given away their lands to another tribe. It is conceded that the United States committed an extraordinary blunder by including the Ponca reservation lands in the 1868 Sioux grant, and the Commission concluded, citing United States v. Klamath and Moadoc Tribes of Indians, 304 U.S. 119 (1938); Shoshone Tribe of Indians v. United States, 299 U.S. 476 (1937), that for this uncompensated taking of land without the consent of the Ponca Tribe, the United States became obligated to render just compensation.
The egregious error of 1868 unleashed a series of events that brought only misery and suffering to the Poncas. Following the ratification of the 1868 Sioux Treaty, there was a marked increase in the number of hostile Sioux raids against the Poncas with the resultant loss of Ponca lives and property. The United States successfully acted to lessen the ferocity and frequency of the attacks by stationing a small detachment of troops near the Ponca Indian Agency; however, some harassment continued. By 1873 the Poncas signified a willingness to remove from their reservation to the Omaha reservation and there join forces with the Omaha Indians with whom they shared much in common. The Omahas were willing to receive the Poncas on their reservation, and twice negotiations were begun to promote the Ponca move; for some reason, however, they failed each time to reach fruition. During the second attempt at negotiations in 1875, it was proposed to the Poncas as an alternative that they remove to the Indian Territory in Oklahoma. There emerged from these later negotiations a document addressed to the President of the United States and signed by the representatives of the tribe, wherein the Poncas seemingly indicated their willingness to remove to the Indian Territory. There is much disagreement over whether the paper evinced an agreement to move or was intended merely to serve as the *679 basis for further negotiations. Whatever interpretation it be given, it is unlikely that the Poncas, illiterate and unsophisticated in matters such as these, understood the instrument. In any event, notwithstanding the repeated recommendation of the Commissioner of Indian Affairs that the Poncas be removed to the Omaha reservation, Congress inserted in the Indian Appropriation Act of August 15, 1876, ch. 289, 19 Stat. 176, the following language:
* * * That the Secretary of the Interior may use of the foregoing amounts the sum of twenty-five thousand dollars for the removal of the Poncas to the Indian Territory, and providing them a home therein, with the consent of said band. (19 Stat. 192)
Similarly, the following year, in the Indian Appropriation Act of March 8, 1877, ch. 101, 19 Stat. 271, 287, Congress appropriated an additional $15,000 “for the removal and permanent location of the Poncas in the Indian Territory.”
The original 1876 appropriation act made it clear that the Poncas were to be relocated only after they had given their consent to move. One E. C. Kemble, United States Indian Inspector, was assigned to the Poncas with instructions to persuade the tribe as best he could that it would be to their advantage to relocate. Further, Kemble was given authority to make an exploratory trip to the Oklahoma Indian Territory with ten members of the Ponca Tribe for the purpose of investigating possible reservation sites. Kemble misrepresented the options available to the Indians and instructed them that they must first consent to surrender their Nebraska reservation before the delegation would be allowed to investigate new tribal sites. The Indians, on the other hand, proposed to withhold their consent to remove until the delegation had found a suitable site in the Indian Territory and concluded negotiations therefor in Washington. Kemble improperly insisted upon interpreting the Indians’ proposal as acceptance of his terms and set out with the delegation of ten chiefs to investigate the Indian Territory. The exploratory trip proved abortive. The group left the Ponca Agency on February 2, 1877, and arrived at the Osage Agency, Indian Territory, on February 9, 1877. No preparations had *680 been made at the Osage Agency to receive the Ponca delegation and for five days it was weatherbound and confined to an uncomfortable cabin. The Indian chiefs preferred to return home and refused to make a final selection anywhere in the territory until they conferred with the tribe. Kemble did not acquiesce in the delegates’ request to return home and on the 15th of February the party left the Osage Agency and proceeded to the Kaw Agency. The Ponca delegates, although well received by the Kaw Indians, repeated that even should they find a piece of land in the territory that suited them they would not select it until they returned to confer with their tribe. They made it clear that they wished to return home immediately and to erase any impression that they had consented to the removal of their people. After this request was denied them, eight members of the chiefs’ delegation, without permission, left the party on February 20, 1877, and ■started northward on foot for their reservation, suffering many severe hardships on their return trip. Kemble then telegraphed the Department of the Interior and inquired if the department would insist on the ultimate removal of the Ponca Tribe to Indian Territory even though the Poncas had withdrawn their consent to remove. He was informed that removal was required and that he should “proceed to Ponca Agency and remove Indians without delay to Kaw "Reservation.” Subsequently, that order was repealed and Kemble was directed by the Commissioner of Indian Affairs to remove the Poncas instead to the Quapaw Reserve in Indian Territory. After a brief return trip, Kemble arrived back at the Ponca Agency on March 10, 1877; however, he ■decided not to begin removal procedures until the eight chiefs who had earlier left him had returned to the tribe. They did not arrive until April 2, 1877, after proceeding on foot for over a month.
Strong opposition to the removal developed among the Poncas after Kemble’s return to the agency, but he nonetheless proceeded with arrangements to move the tribe. In a report directed to the Commissioner of Indian Affairs on April 12,1877, Kemble explained how he had dealt with dissident tribe members:
*681 * * '* I dismissed [the dissident group] with the simple assurance that I should tomorrow start with all the tribe who would go peaceably with me. As for those who refused to leave, I left them in no doubt that they would be required to follow, while those who should undertake to make trouble were reminded that the commanding officer of the Great Father’s soldiers was here to look after them. I then said I would hold no more councils on the subject, and would turn the rebellious members of the tribe over to the military. (Comm’n Finding 15)
When Kemble did begin to proceed to the Indian Territory on April 17, 1877, he was able to persuade only about 170 members of the tribe to proceed with him; the main body of the tribe remained on the reservation. Subsequently, one E. A. Howard, a newly appointed Ponca Agent, was directed by Kemble to return to the reservation to meet with the refractory remainder of the Ponca Tribe and to invite them once more to consider their best interest and remove peaceably. Though no actual force was used at this time or after-wards, United States military forces were in the area, and their presence undoubtedly contributed toward Howard’s success in persuading the main body of the tribe to remove. On May 16, 1877, they started for their new home in the Indian Territory under Howard’s direction.
The Commission’s findings of fact make no mention of the trip of the 170 Indians under Kemble’s direction; however, they clearly delineate the cruel ordeal experienced by the main body of the tribe traveling with Howard. The tiresome march to the Quapaw Eeservation took 65 days and resulted in great hardship. The Indians, particularly the women and children, did not have, nor were they given, adequate clothing for such a trip. The tribe was moved at a time when there were incessant rainstorms, floods, and two tornadoes, all of which in combination destroyed much of the Poncas’ equipment and personal items, caused untold injury, and resulted in a number of deaths.
Most of the Ponca Tribe,[2] which included approximately *682 681 persons, took up residence at the Quapaw Reservation in August 1877, but there was a great deal of discontent. Howard reported to the Commissioner of Indian Affairs the complaints made by the Poncas on October 22, 1877, as follows:
* * * To-day they called on me in full council to make complaints and stated to me as follows: They are very homesick, many of their people and cattle have died here; that they had never made any agreement with the government that they were to remain here; that they had no secured rights to occupy this land; that no provisions had been made to reimburse them for their houses and improvements left in [Nebraska] that they were losing confidence in the government by reason of this delay; and that they had deliberately made up their minds to return to [Nebraska], be the consequences what they might. (Comm’n Finding 20)
The Poncas expressed a desire to see and talk with the “Great Father” in order to make some settlement of their affairs, and a representative delegation proceeded to Washington and held meetings with President Hayes. The minutes of that meeting indicate that in response to their grievances, the President, on November 10, 1877, replied, in part, as follows:
*■ * * Mindful of your conduct, I desire to consult your wishes. There is much good land in the Indian Territory, further away from the white settlements, where you will not be exposed to such annoyances. For the land which you left on the Missouri river, you shall have a tract as large, and as fertile, with plenty of timber and many water-courses. I will permit you to send out some of your chiefs to make a selection for your people among the lands which still belong to the government in the Indian Territory. (Comm’n Finding 21)
Shortly thereafter the Indians chose a section of land between the Arkansas and Chickaskei (Shakaskia) rivers, and in the Indian Appropriation Act of May 27,1878, ch. 142, 20 Stat. 63, 76, Congress provided for the removal of the Poncas to the new area. The Poncas arrived at their new location on July 28,1878. This land belonged to the Cherokee Nation but the United States had the right to locate other Indian tribes thereon under the Treaty of July 19, 1866, 14 Stat. 799.
*683 After their arrival in the new area, the Poncas became anxious to settle definitely the size and boundaries of their new reservation, and, at the same time, they sought payment for the 96,000 acres they had relinquished in Nebraska. In his 1878 Annual Eeport to the Secretary of the Interior, the Commissioner of Indian Affairs reported on the progress of the Poncas and noted that he would seek the introduction of a bill in the next session of Congress which would effect the desires of the Poncas.
Commenting on the Poncas’ original removal from Nebraska, the Commissioner in this report noted the following:
In this removal, I am sorry to be compelled to say, the Poncas were wronged, and restitution should be made as far as it is in the power of the government to do so. For the violation of their treaty no adequate return has yet been made. They gave up their lands, houses, and agricultural implements. The houses and implements will be returned to them, their lands should be immediately paid for, and the title to their present location should be made secure. But the removal inflicted a far greater injury upon the Poncas, for which no reparation can be made— the loss by death of many of their number, caused by change of climate. (Comm’n Finding 23)
The Commissioner of Indian Affairs did present a bill in 1879, but it was not enacted into law. However, in the process of considering the bill, Congress was moved to act. A Senate Select Committee was instructed to investigate the circumstances surrounding the removal and relocation of the Ponca Tribe, and on May 31, 1880, the Committee concluded, inter alia, that the Poncas—
* * * were one of the most peaceable of all the Indian Tribes, that they were dwelling upon a reservation which they had occupied ever since they were known as a tribe, under words of absolute grant from the United States, accompanied by a covenant of peaceable enjoyment during their good behavior; that without their knowledge and without compensation and without a shadow of complaint against them as a tribe, the United States included their reservation by mistake of boundaries within the limits of the reservation set apart for the Sioux; that the United States has never undertaken *684 to compensate them in any way for this attempting to deprive them of their home; * * * that this proceeding on the part of the United States was without justification, and was a great wrong to this peaceable tribe of Indians and demands at the hands of the United States speedy and full redress.
A majority of the Committee recommended that the Poncas be returned to their Nebraska reservation, while the minority recommended that reparations be paid and that the Indian Territory land on which they then resided be purchased for them.
Continuing in their effort to settle their matters, twenty of the Ponca chiefs and headmen directed a petition to the Commissioner of Indian Affairs on October 25, 1880, and noted, inter alia, the following:
* * * Our young men are unsettled and hard to control while they think we have a right to our land in [Nebraska], and our tribe will not be finally settled until we have title to our present reservation and we have relinquished all right to our [Nebraska] land. (Comm’n Finding 26)
The petition concluded with a request that the chiefs be allowed to visit Washington to again attempt a settlement of their grievances. In December of 1880 Ponca delegates did come to Washington and after conferences with the Secretary of the Interior issued a statement on December 22,1880, in which they declared that—
* * * [W]e desire to remain on the lands now occupied by the Poncas, in Indian Territory., the same being a tract of 101,894 acres, and to establish our permanent homes thereon. We desire, further, to relinquish all our right and interest in all the lands formerly owned skid occupied by the Ponca tribe in the State of Nebraska * * *. In compensation for such lands, as well as for the various articles of property we left behind and lost at the time of our removal to the Indian Territory, in the year 1877, and for _ the depredations committed upon us by the Sioux Indians, for which indemnity was promised us, we ask the Congress of the United States to appropriate the sum of $140,000; the sum of $50,000, or so much thereof as may be necessary, to be expended by the Secretary of the Interior for the *685 purchase of the title to the land at present, occupied by the Poncas in the Indian Territory, such title to be invested in the Poncas in fee-simple * * *. (Comm’n Finding 27)
The remainder of the $140,000 was to be, in part, expended, for the purchase of farm animals and agricultural tools, distributed among the tribal members in cash, and approximately $70,000 was to be invested for the benefit of the tribe. Further, the statement declared that—
* * * This sum of $140,000 so expended and invested as aforesaid, is to be a full satisfaction of all our claims for the lands formerly owned and occupied by us in Nebraska and Dakota, as well as for the goods and property lost by us in consequence of our removal to the Indian Territory, * * *.
The same statement was delivered to President Hayes on December 27, 1880, and later referred to in the President’s Message to Congress as “the declaration of the chiefs made December 27,1880.” As hereinafter shown, the requests mad© by the Indians were endorsed by the President and presented; by him to Congress in the form of specific recommendations.Shortly before the issuance of the Ponca statement, the-' President, on December 18, 1880, appointed a special commission and directed it to proceed to the Indian Territory to-investigate the facts surrounding the original removal of the Poncas from the Nebraska reservation and to determine their-present condition. The Commission concluded that the removal was “injudicious and without lawful authority.” Further, it noted that the main body of the tribe agreed to stay on the Indian Territory land; however, it found that those relatively few Poncas who had either remained on or returned to the Nebraska reservation had the strongest possible attachment to their land, were entirely self-sustaining, and were on friendly terms with the neighboring Indian tribes. No suggestion was made that any of the Poncas should again be relocated against their wishes. Instead, the Commission advised that the United States should make “ample and speedy redress of wrongs, thus exhibiting a conspicuous example of the government’s purpose to do justice to all,” (Comm’n Finding 30), and went on to recommend that each *686 Ponca be allowed to choose an allotment of land from either the old reservation in Nebraska or the new Indian Territory site.
On February 1, 1881, President Hayes sent the report of his Commission to Congress along with his own comments and general recommendations. In his Message to Congress accompanying the report, the President made, in part, the following comments:
The report of the Commission appointed by me * * * and the testimony taken by them, and their investigations add very little to what was already contained in the official reports of the Secretary of the Interior, and the report of the Senate Committee touching the injustice done to the Poncas by their removal to the Indian Territory. Happily, however, the evidence reported by the commission and their recommendations point out conclusively the true measures of redress, which the Government of the United States ought now to adopt.
Full compensation should be made for the lands to be relinquished, for their losses by the Sioux depredations, and by reason of their removal to the Indian Territory— the amount not to be less than the sums named in the declaration of the chiefs made December 27, 1880. (Comm’n Finding 31)
As a result of the full-scale investigations made by the Senate’s Select Committee in 1880, by the President’s Commission, also made in 1880, and the President’s recommendations to Congress in 1881, Congress passed the Act of March 3, 1881, ch. 132, 21 Stat. 414, 422, which provided, in part, as follows:
For the purpose of enabling the Secretary of the Interior to indemnify the Ponca tribe of Indians for losses sustained by them in consequence of their removal to the Indian Territory, to secure to them lands in severalty on either the old or new reservation, in accordance with their wishes, and to settle all matters of difference with these Indians, one hundred and sixty-five thousand dollars to be immediately available and to be expended under the direction of the Secretary of the Interior as follows:
For the purchase of one hundred and one thousand eight hundred and ninety-four acres of land in the In *687 dian Territory, where most of these Indians are now located, fifty thousand dollars.
íJí ^ sfi ‡
In addition to the sum authorized for the purchase of land, the appropriation of $165,000 included $10,000 to be distributed among the Ponca Indians in Indian Territory and $10,000 for purchase of farm animals for them; $10,000 to be distributed among the Poncas in Nebraska and $15,000 for houses, agricultural aid, and school purposes there; and $70,000 to be held as a permanent fund at interest for all Poncas.
By an indenture dated June 14, 1888, the land occupied by the Ponca Indians in Indian Territory (stated to consist of 101,894.31 acres) was conveyed by the Cherokee Nation in trust for the use and benefit of the Ponca Tribe of Indians. The land was purchased by the United States from public funds appropriated by the Act of March 3, 1881, for $48,389.46 for the “use and benefit of the Ponca tribe of Indians.”
Subsequently, the Acts of April 30, 1888, ch. 206, 25 Stat. 94, 99, and March 2,1889, ch. 405, 25 Stat. 888, 892 provided for allotments of land in Nebraska to those members of the Ponca Tribe who desired to remain on their old reservation. Allotments made under these acts aggregated 27,235.90 acres of land.
I
As earlier noted, the Indian Claims Commission determined in its interlocutory order of July 26, 1966, that the appellants’ claim for the taking of their Nebraska reservation was subject to offset. That order provided, in part, as follows:
7. In the event the defendant is found liable to the petitioners for the claim asserted herein, the defendant shall be allowed as a payment on the claim, the fair market value of the Ponca reservation in the Indian Territory as of July 28, 1878, the agreed date of evaluation between the parties herein. Defendant, as payment on the claim, shall also be allowed, as a legal offset, to deduct from the total acreage of the subject tract the 27,235.90 *688 acres of allotted lands from the former Ponca reservation in Nebraska.
The Commission made this determination under the authority of Section 2 of the Indian Claims Commission Act which provides, in pertinent part, that—
In determining the quantum of relief the Commission shall make appropriate deductions for all payments made by the United States on the claim,_ * * *; the Commission may also inquire into and consider all money or property given to or funds expended gratuitously for the benefit of the claimant and if it finds that the nature of the claim and the entire course of dealings and accounts between the United States and the claimant in good conscience warrants such action, may set off all or part of such expenditures against any award made to the claimant, except that it is declared to be the policy of Congress that monies spent for the removal of the claimant from one place to another at the request of the United States, or for agency or other administrative, educational, health or highway purposes * * * shall not be a proper offset against any award. (25 U.S.C. § 70(a) (1964).
II
Appellants argue that purchase of the Indian Territory land was simply the last step in the process of the Government’s wrongful removal. Having ceded the Nebraska reservation to the Sioux and brought the Poncas to Oklahoma, the United States, out of necessity, appellant contends, had to find a place for the Poncas to live lest the tribe be abandoned and left homeless. Therefore, appellants would have us find that the purchase of the Indian Territory constituted, at best, a gratuity falling within the exception of Section 2 of the Indian Claims Commission Act which provides that there shall be no offset allowed for “monies spent for the removal of the claimant from one place to another at the request of the United States.” We cannot agree with this contention. Instead, it is our conclusion that the money Congress expended for the purchase of the Indian Territory land, $48,389.46, represents a payment on the Poncas “taking” claim within the meaning of the Indian Claims Commission Act.
*689 The Indian Claims Commission also rejected the appellants’ argument and found too that there had been a payment on the claim. However, our holding differs from that of the Commission in one important respect. The Commission concluded that there was payment on the claim to the extent of the value of the Indian Territory land on July 28, 1878, whereas we decide that there was payment only to the extent of the purchase price paid by the United States. The result we reach here is consistent with other decisions of this court. When before we have been given the option under comparable circumstances to offset Indian “taking” claims by deducting therefrom either the value of land or the purchase price paid therefor by the United States, we have held that the purchase price is the proper measure of adjustment. See, e.g., Kickapoo Tribe of Kansas v. United States, 178 Ct. Cl. 527, 535, 372 F. 2d 980, 985-86 (1967); United States v. Emigrant New York Indians, 177 Ct. Cl. 263, 287 (1966); Sioux Tribe of Indians v. United States, 161 Ct. Cl. 413, 416-17, 315 F. 2d 378, 380 (1963), cert. denied, 375 U.S. 825. That these cases treated the purchase of land as offsets within the gratuity provisions of Section 2 rather than as direct payments on the claims, does not, in our view, affect their applicability. This is because the gratuity provisions, by allowing offsets for either “property given * * * or funds expended” present the court with a choice between applying the purchase price of property (the funds expended) or its value as of a given date in reduction of the claim.
By way of clarification, we should say that our decision to apply the purchase price as the payment on the claim is not precluded by the stipulations of the parties. The parties did agree, for the purpose of determining the amount of the offset, that the Indian Territory land would be valued as of a given date “if the value of the reservation in Indian Territory * * * should be allowable as an offset to said claim” [emphasis added]. The stipulation does not deter us from treating sua sponte, as the payment on the claim, the amount of the purchase price rather than the value of the land, for we have not allowed the value of the reservation as an offset. Clearly, our determination is wholly within *690 the question stipulated to the Commission for decision— “Whether the reservation in the Indian Territory shall be allowable as an offset to the petitioners claim.” We have found that the Indian Territory shall be allowed as an offset, but only to the limited extent of the purchase price paid therefor.
Although we hold that it is the purchase price and not the value of the Indian Territory land that represents a payment on the claim, we are in agreement with the Commission that the land, whether measured by its price or its value, can be treated as a payment on the “taking” claim, and our reasons for reaching that conclusion are much the same as those suggested by the Commission.
We think that the language of the Act of March 3, 1881, cited above, which appropriated the $50,000 for the purchase of the land, evidences an intent on the part of Congress that the purchase of the Indian Territory land be a payment on the Poncas’ claim for the wrongful taking of their Nebraska reservation. We note in particular the declared purpose of that portion of the act relating to the Poncas which, in the language of the statute, was to “indemnify the Ponca tribe * * * for losses sustained by them in consequence of their removal * * * and to settle all matters of difference with these Indians * * *.” [emphasis added].
Clearly, a concern that the Poncas should somehow be given redress for the taking of their Nebraska reservation was a “matter of difference” which dominated much of the attention of both the Government and the Indians for some period before Congress finally acted, and there can be little doubt that when Congress provided the $50,000 for the purchase of the Indian Territory land it sought to “indemnify” the Poncas for the loss of their old reservation. Our interpretation of the statute and the intent of Congress in providing for its enactment is amply buttressed by the events already discussed at length, which immediately preceded the legislation. By way of brief review, we call attention to the following: President Hayes’ instructions of November 1877 in which he suggested that the Poncas send out a delegation to choose the land they finally settled upon, explaining that *691 “For the land which you left on the Missouri river, you shall have a tract as large, and as fertile * * the 1818 Annual Keport of the Commissioner of Indian Affairs, which noted that he would propose legislation to see that “The houses and implements will be returned to them, their lands should be immediately paid for, and the title to their present location should be made secure”; the December 1880 statement issued by the Ponca chiefs in which they, in effect, agreed to relinquish their Nebraska land in return for the Government’s appropriation and expenditure of moneys, in part, for new land; and the reports of both the Senate Select Committee and the President’s Special Commission which noted that speedy redress was required for the Poncas’ uncompensated deprivation of their Nebraska land.
In our view, the documents, reports, and communications, previously summarized, indicate beyond all doubt that for years before the Act of March 3, 1881, there was general agreement and understanding by both the Indians and representatives of the Government that there was a wrongful taking of the Nebraska reservation which required redress, either by returning the Poncas to their old reservation or providing them with title to the new lands on which they had settled in the Indian Territory. In his Message to Congress one month before the passage of the Act of March 3, 1881, President Hayes called the attention of Congress to all the facts we have recited above and specifically recommended that “(f)ull compensation should be made” for the formal relinquishment of the Nebraska land and for the losses sustained by the Poncas in an amount not less than the sums requested by the Ponca chiefs in their December 1880 statement, to wit, $140,000 — $50,000 of which was to be used to purchase their new lands.
When Congress acted, after considering the complete and compelling body of documentation, investigatory material, and recommendations with respect to the Poncas, there can be little doubt that one of its paramount concerns was to provide the Poncas a quid pro quo for the loss of their reservation. For these reasons, we hold that when the United States finally purchased the Indian Territory with $48,389.46 *692 from the $50,000 fund appropriated for that purpose, it made payment to that extent on the Poncas’ claim for the wrongful taking of their Nebraska reservation.
It will be recalled that the Act of March 8, 1881, in addition to providing $50,000 for the purchase of Indian Territory land, appropriated $115,000 for other purposes, including small per capita distributions in cash and funds for educational purposes, and for the purchase of farm animals, dwelling places, agricultural implements, and the like. The moneys made available for such purposes were not intended as payments on the “taking” claim, and therefore they cannot be deducted under the “payment on the claim” clause of Section 2 of the Indian Claims Commission Act. We think, as the language of the appropriation act strongly suggests, that the additional funds represented indemnification for the wrongs the United States had inflicted upon the Poncas from the time of their removal from the Nebraska reservation in 1877 until they were finally and comfortably settled either with the main body of the tribe in the Indian Territory or with the smaller group which again took up settlement in Nebraska. To the extent that any of these payments represented gratuities under the second clause of Section 2, they were either “moneys spent for the removal of the claimant from one place to another” or funds which the Commission could not “in good conscience” set off against an award, so that, in either event, they are inapplicable for offset treatment under the terms of that clause. See generally, Menominee Tribe of Indians v. United States, 118 Ct. Cl. 290 (1951).
Ill
We cannot agree with the Commission’s finding on the matter of allotments, and we hold that the 27,285.90 acres allotted to individual Poncas residing in Nebraska were not in the nature of a tribal indemnity for the land earlier taken but rather were intended to inure to the benefit of the individual recipients alone. The decision of the majority of the Commission concedes that the ultimate benefits derived from the allotments were to the individual Indians but insists that *693 the benefits were initially tribal in nature. We find no adequate support for tbis conclusion of law.
The Act of April 30, 1888, ch. 206, 25 Stat. 94, the statute in which the original allotments were provided for, was enacted for the purpose of dividing the Great Sioux Reservation into several smaller reservations and releasing the remainder of the land for settlement. The Great Sioux Reservation included the old Ponca Reservation on which, the Poncas who had returned to Nebraska had resettled. Under the statutory scheme, however, the old Ponca Reservation was not included within one of the new smaller reservations ; instead, this area was intended to provide a portion of the land on which settlement was eventually to be allowed. To provide for the Poncas and other Indians who were not to be settled on the new reservations, the act provided that uany Indian * * * residing upon any portion of said Great Reservation not included in either of the separate reservations herein established” (25 Stat. 99) [emphasis added] could elect to have an allotment. The legislation then went on to explain that the land remaining after allotments had been selected would be declared open for settlement by the President.
We think it clear that the legislation was not specifically designed to provide a particular benefit to the Ponca Tribe. Rather, the allotments were provided for “any Indian” residing outside one of the newly formed reservations, and the broad design of the entire statutory scheme was to provide new lands for white settlement. There was certainly absent any intention to indemnify the Ponca Tribe for earlier taking of their reservation, and, under these circumstances, we find that the allotments in no way constituted a payment on the tribal claim.
Moreover, to the extent that the allotments conferred a benefit, it was individual and not tribal in nature, and therefore equally inapplicable for offset treatment under the gratuity clause of Section 2 of the Indian Claims Commission. Act. This court has frequently noted the distinction between individual and tribal benefits and recognized that only the latter are appropriate for application as offsets. Kickapoo *694 Tribe of Kansas v. United States, 178 Ct. Cl. 527, 537, 372 F. 2d 980, 986 (1967); Red Lake, Pembina and White Earth Bands v. United States, 164 Ct. Cl. 389, 397 (1964); United States v. Kiowa, Comanche & Apache Tribes of Indians, 143 Ct. Cl. 545, 550, 166 F. Supp. 939, 943 (1958), cert. denied, 359 U.S. 934 (1959).
The interlocutory order of the Commission is reversed insofar as it concludes that the 27,235.90 acres allotted to individual Poncas in Nebraska represented a payment on the claim, and is modified as indicated in this opinion to allow as payment on the claim only the $48,389.46 purchase price expended by the appellee on the Indian Territory land.
. The case is remanded for further proceedings consistent with this opinion.

Affirmed in part with modifications, reversed in part, and remanded.

 The Ponca Tribe of Indians is recognized to consist of two branches, the Ponca Tribe of Indians of Oklahoma and the Ponca Tribe of Native Americans of Nebraska; this suit was brought before the Indian Claims Commission on ¿behalf of all members of the Ponca Tribe embraced by both branches.

 Some of the Poncas had Insisted on remaining on the Nebraska reservation and some continued to return. Therefore, although the main body of the tribe remained in the Indian Territory, a small contingent of the tribe, later to be recognized as the Nebraska branch, resided in Nebraska. To avoid confusion, however, it should be kept in mind that this discussion of the facts comprehends the Nebraska members of the tribe only when specifically noted.