Dureee, Judge,
delivered the opinion of the court:
This is an appeal from an Indian Claims Commission decision [1] which held that petitioners failed to prove aboriginal title[2] to some 298,634 acres of land that had become part of the Public Domain of the United States under the Treaty of Guadelupe Hidalgo with Mexico in 1848.[3] The 298,634 acres are part of a 520,000 acre tract located in what is now Sandoval County, New Mexico. The tract was known as Oro *503 Del Espíritu Santo (Holy Ghost Spring); it is bounded on the north -by the Ventana, on the south by the stone ford of the Puerco Eiver, on the east by the boundary line of Eange 3 East, and on the west by the Puerco Eiver.
This appeal concerns only the acreage of the above-described tract that became part of the public domain of the United States by virtue of the Treaty of Guadelupe Hidalgo. Appellants concede the correctness of the Commission’s determination that they have no aboriginal claim to Spanish grants which encroach on the claimed area, anee these grants were all held valid and patented by the United States, and hence were private property as of the time of the Treaty.
The Commission did hold that appellants could prosecute a valid claim based on aboriginal title to public lands despite the fact that the bands had received valid Spanish grants of other parcels of land. The issue presented to us in this appeal is whether the Commission was correct in its holding that appellants failed to adequately discharge the burden of going forward with affirmative evidence to establish Indian title.
Appellants contend that they presented substantial evidence sufficient to warrant a judgment in their favor absent controverting evidence; that the burden of disproving their claim of Indian title shifted to appellee which failed to come forth with any evidence.[4] Eather than controverting appellants’ evidence, appellee had elected to' rely upon a theory of law which was ultimately rejected by the Commission. Despite appellee’s failure to offer evidence tending to disprove Indian title; despite the consequently uncontroverted testimony and evidence introduced by appellants, the Commission held that “the evidence offered is so vague and indefinite that a finding of aboriginal title in the petitioners to any of the claimed area would have to be based on mere conjecture.” We must now determine whether the Commission was correct in this conclusion, for where there is “* * * positive testimony, uncontradicted, and not inherently improbable”, the trier of fact, whether judge or jury, is not “at *504 liberty to disregard snob evidence.” Stone v. Stone, 136 F. 2d 761, 764 (CADC 1943).[5]
To best approach onr problem, we will discuss in turn each of the three major lines of'evidence introduced by ¡appellants below along with the Commission’s treatment of each.
Appellants began the trial by calling a council member from each of the bands. These witnesses, leaders of their respective bands, offered testimony of their people’s usage of the land throughout their tribal histories. It might be mentioned here that the tribal histories consist of oral accounts handed down from father to son in continuity — from generation to generation from time immemorial. Traditionally, this has been the principal tribal record of the history of all Indian tribes. These three Indian leaders testified from knowledge so gained through this oral tradition that the tribes had used all of the claimed area for farming, hunting, mining, grazing livestock, and gathering of firewood. Portions of their testimony were verified by documentary evidence. For example, one witness, Toya, testified about the creation and use of a watering place known as Los Torriones. The fact of existence and usage of this same watering place by the Indians was corroborated through the introduction of a letter written on April 6,1878 by one Ben W. Thomas, Indian Agent, who said that “this location * * * is believed to be on the public domain.” Notwithstanding such specific documentary corroborations and the general dovetailing, and hence corroboration of historical and archaelogical evidence and testimony which we are about to discuss, the Commission saw fit to Virtually ignore the Indians’ testimony since:
* * * all of these witnesses were comparatively young men (ages 47 to 59) who, in point of time, are far removed from the issue in question and who have an obvious interest in the outcome of the case.. (11 Ind. Cl. Comm, at 168).
*505 But it must be remembered that the testimony offered by these witnesses was corroborated. We cannot agree with appellee that “testimony of that kind is literally worthless and was justifiably not given any weight by the Commission.” [Emphasis added.] [6] Such evidence is entitled to some weightit cannot be ignored or discarded as “literally worthless.”[7]
The second line of evidence introduced by appellants was historical in nature. Ward Allen Minge, an historian, testifying as an expert witness, traced these bands from the Coronado Expedition in 1540 to the mid-nineteenth century. Throughout this four-century period, these bands occupied this territory. Through the exploitation of the Spanish, through famine, pestilence, plagues, natural disasters, warfare with the Spanish, raids by Navahos and Apaches and the encroachment of settlers, these once populous, once rich bands were reduced in size to a relative handful of tribal descendants ekeing out a mere existence in a desert area equally, impoverished. This was the gist of Mr. Minge’s testimony. On cross-examination, he testified that, throughout his research on the history of this area, he had found no reference “relating to the occupation of the Navahos in any way, or the Apaches in any way, or any permanent residences *506 in this area.” In sum then, Minge testified that historical evidence indicated sole use and occupation (aside from the Spanish grantees) of this entire area. From his testimony, it appears that these three tribes used acreage exceeding the tract claimed and here at issue.
The Commission felt that Minge’s testimony failed to adequately demonstrate a relationship between the historical evolution of the tribes and their “exclusive use and occupancy” of the land. Further, the Commission felt that Minge had failed to “pinpoint the extent of petitioners’ exclusive use and occupancy of the claimed area as of the critical date.” But as we have seen, Minge’s testimony did tend to establish exclusive occupation. And while the extent of exclusive occupation was not pinpointed, the testimony relating to exclusive occupation referred to an area exceeding, but including the claimed land.
The third and last line of evidence introduced by claimants was that of archaeology. This evidence strongly confirmed the historical evidence and testimony referred to above. Although admitting that this testimony established claimants’ use and occupation of lands including some outside the claimed area, the Commission again emphasized the failure to pinpoint “the area of exclusive use and occupancy as of 1848.” The Commission disregarded the archaeologist’s testimony that the Santa Anas farmed in the southwest comer of the claimed area until 1875 since Dr. Ellis “did not give the source of this 'information.” The Commission felt that “presumably it was based on the traditions of the Pueblos as was the petitioners’ claim to ownership of peach orchards in this general area,” — evidence already disregarded by the Commission.
Although the Commission recognized that:
All witnesses seem to agree * * * that no other Indians permanently inhabited this area although the Navahos raided a good deal from the north and west, sometimes penetrating to the Pueblos themselves * * *,
it was of the opinion that “the evidence offered is so vague and indefinite that a finding of aboriginal title in the petitioners to any of the claimed area would have to be based on mere conjecture.” We disagree. First, the Commission *507 should have accepted as proven the exclusive occupation of this area by claimants. Competent and material evidence by all witnesses established this point. No contrary evidence was offered. The entirety of the testimony and the evidence can lead only to the conclusion that these bands were the only aboriginal bands occupying this territory.[8] Claimants then, did establish at least one element of aboriginal title,- — exclusive occupation and usage.
The Commission apparently felt that even having established exclusive occupation, claimants failed to accurately delineate their claim. But it must be recalled that the evidence tended to prove exclusive occupation and use of lands exceeding those claimed. While it is true that the outermost boundary of exclusive occupation and usage was not established, the evidence did indicate that the exclusively occupied and used terrain extended beyond the claimed area on all fronts. The greater must of course include the lesser. If the proof established exclusive occupancy and use of an area transcending the claimed area, but not otherwise defined, we think it but logical to conclude that the exclusive occupancy and use of the lesser, claimed area was established. Again we must point out that there was no controverting testimony. While the Commission was correct that the testimony did not pinpoint the area exclusively occupied, a judgment for claimants would not have been based solely on conjecture since it was established through substantial and uncontro-verted evidence that claimants did enjoy occupancy and usage of at least the claimed area.
One last point should be discussed. Though the Commission rejected the Government’s legal theory that the receipt of the Spanish grants disqualified a claim of aboriginal title, it asserted that:
“there is evidence to indicate that petitioners’ Spanish land grants and other lands outside the above 298,634 acres, which were used by petitioners in 1848, were sufficient for their needs at that time.”
Perhaps this explains the Commission’s concern about the population of the bands in 1848. However, we do not be *508 lieve the question before the Commission was what lands would be “sufficient for their needs at that time,” — the question was whether the lands in issue belonged to claimants through Indian title. Moreover, our reading of the evidence leads us to' a conclusion contrary to that of sufficiency advanced by the Commission. The 298,634 acres were essential to the bands’ existence during the mid-nineteenth century. Official United States records, in evidence, as well as the testimony of the witnesses, pointed not only to the usage of this acreage but to the abj ect poverty of these peoples, despite the use of this tract. From the various reports, petitions, and letters in evidence, one can piece together a picture of this area. The land was mostly arid; little grazing was to be found; water holes and creeks were sparsely scattered and had been seized and used by Mexican and/or American settlers; irrigation was virtually non-existent. In 1866, one Vincent Montoya, testifying before the Surveyor General, described the land as being “* * * all bleak and sterile, producing nothing except when rains are seasonable, and then only in very limited and inconsiderable degree.”[9] At page 4 of a 1949 report from the Committee on Interior and Insular Affairs,[10] we find opinion to the effect that the “resources of the Indian tribes in the region were so meager that unless their land holdings could be augmented, they faced the prospect of perpetual and degrading poverty. Indeed their very existence was threatened.”
Consequently we cannot agree with the Commission that the lands covered by the grants were “sufficient for their needs.” And while claimants did use “lands outside the above 298,634 acres,” as the evidence indicated, this use of other lands'cannot disenfranchise claimants of Indian title to the claimed tract. The use of the “lands outside” as well as the claimed area merely facilitates our conclusion that claimants did adequately discharge their burden of proof.
Upon the foregoing, we conclude as a matter of law that claimants were entitled to a favorable determination on their claim of Indian title before the Indian Claims Commission. *509 The claimants did establish aboriginal title to the claimed tract. Accordingly, this case is remanded to the Indian Claims Commission for a determination of the value of the land at the time of the taking in this case, which was agreed upon at the oral argument by counsel for the parties to have occurred in 1848 on the date of the Treaty of Guadelupe Hidalgo with Mexico.
The case is hereby remanded to the Indian Claims Commission for proceedings consistent with this opinion.

Reversed and Remanded

On January 22,1965, the court issued the following order:
This case comes before the court on petitioner-appellants’ motion to amend the order entered herein on October 16, 1964, under which this case was remanded to the Indian Claims Commission for a determination of the value of the land at the time of taking, which was agreed upon at oral argument by the parties before the court to have occurred in 1848 on the date of the Treaty of Guadelupe Hidalgo with Mexico.
In support of this motion, the appellants assert that counsel had no intention or authority from its clients to argue that the time of taking of the lands involved in this action took place in the year 1848. Appellants now urge that they should not suffer considerable loss in damages because of an erroneous impression apparently made by counsel of the parties “during the heat of oral argument” that the date of taking was the year 1848. The court is unimpressed by this argument and does not accept it as a reason for amending the order. We do not expect precise regulation of the temperature of oral argument, but we do expect and require precision in statements of fact made by counsel to the court, whether oral or written.
However, it does appear from the record that the issue on the date of taking of appellants’ lands by the Government was not introduced 'before the Indian Claims Commission or determined by its decision. Neither the appellants, the appellee, nor Amici Curiae in this case now contend that the Treaty of Guadelupe Hidalgo with Mexico in 1848 extinguished the “Indian title” of the Indian tribes involved. Accordingly,
*510 IT IS ORDERED this 22nd day of January, 1965, that petitioner-appellants’ motion be and the same is granted in that the case is remanded to the Indian Claims Commission in order for it to receive evidence as to the time of taking of the acreage in question by the United States from petitioners and for determining the value of the lands as of the time it fixes as the date of taking.

 Appeal is from Docket 137. See findings of fact and opinion of the Commission 11 Ind. Cl. Comm. 131 (1962).

 This appeal is limited to Count 4 of appellants’ petition. Appellants accept the Commission’s determination that the additional 221,360 acres claimed had been the subject of Spanish Land Grants that had been confirmed by the united States, and had hence never become part of the Public Domain, cf. Pueblo De Cochti v. United States, 7 Ind. Cl. Comm. 422 (1959); Pueblo de Isleta v. United States, 9 Ind. Cl. Comm. 619 (1959), aff’d 152 Ct. Cl. 866 (1961), cert. denied 368 U.S. 822 (1961).

 9 Stat. 922 (1848).

 cf. Rehm v. United States, 183 F. Supp. 157 (1960), for discussion of when a party is entitled to a directed verdict; see, generally, MeGormiclc, Evidence § 306.

 The court relied on George v. Capital Traction Co., 54 App. D.C. 144, 147, 295 Fed. 965, 968 (1924) for the proposition that:
* * * where the testimony Is all one way, and is not immaterial, irrelevant, improbable, inconsistent, contradicted, or discredited, such testimony cannot be disregarded or ignored by judge or jury, and if one or the other makes a finding which is contrary to such evidence, or which is not supported by it, an error results, for which the verdict or decision, if reviewable, must be set aside. * 0 * See also Kelly v. Jackson, 6 Pet. (10 U.S.) 622 (1832).

 Appellee’s brief p. 12 ; appellee there discussed Confederated Tribe of the Warm Springs Reservation v. United States, 8 Ind. Cl. Comm. 557, 598 (1960) where the Commission discussed this type of evidence and concluded that “the most dependable accounts by Indians of their pre-reservation land-using entities and subsistence areas are those taken from Indians living as near the date in question as possible; that the possibility of error increases in ratio to the number of intervening generations.” This statement is undoubtedly true but only affects the weight given the testimony by the trier.and does not render the testimony “literally worthless.” (Where the testimony of Indians several generations removed is corroborated, its weight must be corresporidlingly increased. (And a demonstration of accuracyi of a part of such testimony imparts credence to the whole in the absence of controverting evidence, pf. Associated General Contractors v. Cardillo, 80 App. D.C. 303, 106; E. 2d 327 (1939) for a discussion of corroboration.

 cf. Rapid Transit Co. v. United States, 295 F. 2d 466 (CA 10, 1961), cert. denied 369 U.S. 819 (1962), where the 10th Circuit adopted the rule enunciated in Gibbs v. Central Surety and Ins. Corp. 163 Kan. 252, 181 P. 2d 498 (1947), as follows:
* * * [Wjhere plaintiff produces two witnesses who testify on every material element of plaintiff’s cause of action, and such testimony is not inherently improbable or uncandid, and the cross-examination does not develop any conflict, and the defendant produces no testimony in opposi-ition, the trier of fact is not justified in arbitrary or capriciously disregarding such testimony.

 The grantees of the encroaching grants occupied their lands, but those tracts are not here involved.

 Def. Ex. 4.

 Def. Ex. 32; S. Rep. No. 549, 81st Cong. 1st Sess. (1949).