The UNITED STATES of America

v.

PUEBLO DE ZIA et al.

Appeal No. 1–72.

United States Court of Claims.

Feb. 16, 1973.

Mark J. Clayburgh, Albuquerque, N. M., attorney of record, for appellees; Claude S. Mann, Albuquerque, N. M., of counsel.

Bernard M. Newburg, Washington, D. C., with whom was Asst. Atty. Gen. Kent Frizzell, for appellant.

Before COWEN, Chief Judge, DURFEE, Senior Judge, and DAVIS, SKELTON, NICHOLS, KUNZIG, and BENNETT, Judges.

## ON APPEAL FROM THE INDIAN CLAIMS COMMISSION IN DOCKET NO. 137

DURFEE, Senior Judge:

The Government here appeals from a final judgment and order of the Indian Claims Commission disallowing certain claimed gratuities as offsets against the final award in the Commission's Docket No. 137. Docket No. 137 initially involved a claim by the three Indian pueblos of Zia, Jemez and Santa Ana under Section 2, Clause 4 of the Indian Claims Commission Act (60 Stat. 1049, 1050)[1] that through various acts the United States had taken without compensation some 520,000 acres of land in north central New Mexico belonging to these pueblos.

In its first ruling on this claim, 11 Ind.Cl.Comm. 131 (1962), the Commission found that the three pueblos had failed to establish aboriginal use and occupancy title to the 520,000 acre tract. The pueblos appealed only from that part of the determination of the Commission which held that the pueblos failed to prove aboriginal title to some 298,634 acres of land that had become part of the public domain of the United States under the Treaty of Guadelupe Hidalgo with Mexico in 1848, 9 Stat. 922 (1848).[2] In reversing the Commission, this court ruled that as a matter of law the pueblos had established aboriginal title to these 298,634 acres. 165 Ct.Cl. 501 (1964). The cause was remanded to the Commission to determine the time of "taking" of these lands and their values.

On the remand the Commission found that the first substantial inroads upon the pueblo lands occurred with the creation of the Jemez Forest Reserve on October 12, 1905. 19 Ind.Cl.Comm. 56 (1968). A substantial part of the 298,634 acres was further found to have been taken by virtue of the creation of Grazing District No. 2 on April 4, 1936, pursuant to the Taylor Grazing Act of June 28, 1934, 48 Stat. 1269. Additionally, the Commission found that a scattering of 114 homesteads deprived the pueblos of aboriginal lands.[3] Pursuant to these findings and decision of the Commission, the parties entered into a stipulation[4] filed on August 27, 1968,

---

1. 25 U.S.C. § 70a.

2. The pueblos accepted the Commission's determination that the additional 221,360 acres claimed had been the subject of Spanish Land Grants that had been confirmed by the United States and hence had never become part of the public domain. cf. Pueblo de Cochiti v. United States, 7 Ind.Cl.Comm. 422 (1959); Pueblo de Isleta v. United States, 7 Ind. Cl.Comm. 619 (1959); aff'd 152 Ct.Cl. 866 (1961); cert. denied 368 U.S. 822, 82 S.Ct. 39, 7 L.Ed.2d 27 (1961).

3. The Commission suggested that the parties agree upon an average date of entry for these homesteads with the average date of entry serving as the date when Indian title to these homestead lands collectively was extinguished.

4. The parties agreed that 34,900.27 acres had been taken by creation of the Jemez Forest Reserve on October 12, 1905; that 16,811.74 acres were taken during 1920 by various homestead or preemption entries; and that 230,703.72 acres were taken by creation of Taylor Grazing District No. 2 on April 4, 1936.

and approved by the Commission, setting forth the dates, acreages, and methods by which the Indian title had been extinguished to an agreed 282,415.73 acres of land.[5]

On April 21, 1969, defendant United States filed a "Motion for Pretrial Determination of the Basis for the Appraisal of Gratuitous Offsets of Real Property." The Motion was argued before the entire Commission, and the Commission in a unanimous decision, 21 Ind.Cl.Comm. 316, 318 (1969), ruled that "the proper basis for the valuation of the trust lands as an offset in this case should be the funds actually expended for these lands by the United States rather than their fair market value at the time they were put in trust for the plaintiffs."

### REAL PROPERTY OFFSET TABLE

| Item No. | Acreage | Indian title | Vendor | Acquisition date | Trust date | Trust act | Trust grantee |
|---|---|---|---|---|---|---|---|
| 1 | 15,609.80 | No | Thompson | 11-27-1934 | 8-13-1949 | 8-13-1949 | Zia |
| 2 | 4,074.18 | No | San Ysidro | 4-22-1936 | 8-13-1949 | 8-13-1949 | Zia |
| 3 | 1,092.05 | No | San Ysidro | 4-22-1936 | 8-13-1949 | 8-13-1949 | Jemez |
| 4 | 11,466.62 | Yes | Santa Fe R.R. | 1-17-1935 | 8-13-1949 | 8-13-1949 | Zia |
| 5 | 1,521.54 | Yes | New Mexico.a | 7-20-1962 | 7-20-1962 | 8-13-1949 | Zia |
| 6 | b 40,168.00 | No | Espiritu | 12-27-1934 | 8- 2-1956 | 8- 2-1956 | Zia |
| 7 | c 1,048.00 | Yes | Appellees | 4- 4-1936 | 8- 2-1956 | 8- 2-1956 | Zia |
| 8 | 35,483.00 | No | Espiritu | 12-27-1934 | 8- 2-1956 | 8- 2-1956 | Jemez |
| 9 | d 869.00 | Yes | Appellees | 4- 4-1936 | 9-14-1961 | 8- 2-1956 | Jemez |
| 10 | 640.00 | No | Espiritu | 12-27-1934 | 6-29-1960 | 6-29-1960 | Zia & Jemez |
| 11 | e 47,438.56 | Yes | Appellees | 4- 4-1936 | 9-14-1961 | 9-14-1961 | Appellees |
| 12 | 3,520.00 | No | Mexico | 2- 2-1848 | 9-14-1961 | 9-14-1961 | Santa Ana |
| 13 | 428.00 | No | Thompson | 11-28-1934 | 9-27-1968 | 3- 7-1966 | Zia |
| 14 | 2.81 | No f | Santa Ana | 1920 | 9-27-1968 | 3- 7-1966 | Santa Ana |
| 15 | 2,081.07 | Yes | New Mexico.a | 8-23-1966 | 8-23-1966 | 9-14-1961 | Santa Ana |
| 16 | 1,645.01 | Yes | New Mexico.a | 11-12-1968 | 11-12-1968 | 9-14-1961 | Appellees |

a By exchange of land of equal value.

b Items 6 and 7 were placed in trust for the Zias as one parcel.

c This was public domain land held to have been "taken" on April 4, 1936, but treated differently from the 47,438.56 acres for which an offset of $2.50 an acre was allowed by the Commission. Plaintiffs were awarded $3,406 for this land at $3.25 an acre.

d Items 8 and 9 were placed in trust for Jemez as one parcel.

e These are the public domain lands for which the Commission allowed $2.50 an acre in offsets, after holding that following their "taking," for which the United States was held liable at $3.25 an acre, they had been used by appellees at least since 1939.

f Indian title not involved because purchased from Santa Ana Pueblo. This site was improved by the construction of buildings.

On December 17, 1970, 24 Ind.Cl. Comm. 270, the Commission ruled that the total fair market value, given the various times of taking, of the 282,415.73 acres of aboriginal land, was $938,000.00. Against this interlocutory gross award defendant requested an offset of $1,004,718.00 representing the fair market value of 167,067.64 acres of land acquired by the United States and then placed in trust as various times between 1949 and 1968 for the benefit of plaintiff pueblos by Presidential Executive Orders and Acts of Congress. The 167,067.64 acres of claimed offsets have been grouped into 16 items and identi-

5. The difference between this figure and the 298,634 acres represents land to which Indian title was found by the Commission, 19 Ind.Cl.Comm. 62–65, never to have been extinguished. This difference consists of aboriginal lands which were set aside for the pueblos by Executive Orders dated December 19, 1906 (3 Kapp. 686), October 4, 1915 (4 Kapp. 1029), November 6, 1920, February 16, 1922, and by the Act of April 12, 1924 (43 Stat. 92).

fied in a Real Property Offset Table, supra, for purposes of this opinion.[6] Defendant United States also sought an offset of $57,451.80 for various gratuitous "cash" expenditures for personal property and services claimed to have benefited the three pueblos.

The Commission allowed a real property offset of $118,596.00 for a group of 47,438.56 acres of land, but disallowed 119,629.08 acres of claimed offsets comprising 15 separate groups of land.[7] 26 Ind.Cl.Comm. 218. Of the $57,451.80 claimed "cash" gratuities, the Commission allowed $52,467.92. Appellant, the United States, alleges various errors with respect to the holding of the Commission as to each of the 15 groups of land offsets disallowed, as to the one group of land for which an offset was allowed, and as to two "cash" gratuity items disallowed. We affirm the final judgment and order of the Commission with respect to the real property offsets with the exception of a group of 3,520 acres which was improperly disallowed.[8] We affirm the judgment of the Commission as to the disallowance of the "cash" gratuity of the vehicles, but reverse as to the disallowance of the entire grazing fee "cash" gratuity.

## I. THE REAL PROPERTY OFFSETS
*Items 1, 2, 3, 4, 6, 8, 10 and 13*

Section 2 of the Indian Claims Commission Act (60 Stat. 1049, 1050) instructs that the Commission, in determining the amount of relief to be afforded successful claimants, "may also inquire into and consider all money or property given to or funds expended gratuitously for the benefit of the claimant and if it finds that the nature of the claim and the entire course of dealings and accounts between the Unit-

ed States and the claimant in good conscience warrants such action, may set off all or part of such expenditures against any award made to the claimant."

Not all "money or property given to or funds expended gratuitously for the benefit of the claimant" properly qualify as an offset under the Act. Section 2 of the Act further provides that a proper offset shall not include *inter alia:* " * * . * expenditures under any emergency appropriation or allotment made subsequent to March 4, 1933, and generally applicable throughout the United States for relief in stricken agricultural areas * * *." 25 U.S.C. § 70a. Relying upon this express exclusion, the Commission disallowed offsets for Items 1, 2, 3, 4, 6, 8, 10 and 13.[9] The findings supporting these disallowances are supported by substantial evidence and we affirm the Commission's conclusion as to disallowing these groups of claimed offsets.

These eight groups of land were purchased by the United States under emergency relief legislation of the 1930's, and thereafter placed in trust for plaintiffs. The purchases were made under Title II of the National Industrial Recovery Act of June 16, 1933 (48 Stat. 200), the Emergency Relief Appropriation Act of April 8, 1935 (49 Stat. 115), Section 55 of Title I of the Act of August 24, 1935 (49 Stat. 750, 781), and the Bankhead-Jones Farm Tenant Act of July 22, 1937 (50 Stat. 522, 525). Appellant does not dispute that the lands in question were acquired under emergency appropriations of the kind falling within the improper-offset provisions of Section 2 of the Indian Claims Commission Act.[10] Instead, appellant advances a

6. The "Item" references hereafter used in this opinion relate to the claimed real property offsets identified by "Item No." in the aforementioned table.

7. Item 11 in the table represents the land for which the only real property offset allowance was permitted.

8. The 3,520 acres constitute Item 12 of the Table, *supra.*

9. The findings of fact of the Commission, 26 Ind.Cl.Comm. 218, relating to each group of land are as follows: Items 1, 2, 3 (Finding 60); Item 4 (Finding 61); Items 6, 8 (Finding 62); Item 10 (Finding 63); Item 13 (Finding 64).

10. On page 37 of its brief appellant states: "All the lands were unquestionably purchased under emergency legislation of the 1930's. * * *"

rather convoluted argument which, when reduced to its essentials, has two prongs.

The first prong is an extension of the argument advanced before the Commission, and reargued before us, that with respect to Items 1, 2, 3, 4, 6, 8, 10 and 13, the claimed offsets are not the "expenditures" for these lands, but rather the lands themselves. Appellant argues that whereas a gratuity of expenditures for land may fall within the prohibition of the Act against allowing as an offset "expenditures" under emergency legislation, a gratuity of the land itself does not fall within this prohibition. Appellant seeks to support its position by attempting to demonstrate that at the time of the appropriations or expenditures under the emergency legislation to purchase the lands in question, there was no expression of the intention that the lands were to be purchased "solely for Indian purposes." The absence of some link between plaintiff pueblos and the *expenditures* for these lands is further evidenced, appellant argues, by the lapse of time between the purchases and the times of transfer in trust as well as by the uses other than "Indian purposes" to which these lands were put after their purchase but prior to their dedication to the pueblos. Appellant's baseline proposition then is that the "expenditures" for these eight groups of land were not "made with appellees in mind," and therefore the gratuities do not fall within the proscription against offsets of expenditures under emergency relief measures. Thus, says appellant, the Commission was in error when in holding that the gratuities involved are the expenditures and not the lands themselves, it said: "The donation of the beneficial interest to the plaintiff pueblos was no more than the last step in a chain of facts in which the pueblos were always involved from the dates of the initial purchases until the transfers in trust for the plaintiffs." 26 Ind.Cl. Comm. 218, 235.

■■ The record amply supports the Commission's finding and the Commission therefore properly concluded that the gratuities involved are the "expenditures" excludable as offsets under the Act. As the Commission pointed out, the land acquisition program under which these eight groups of land were purchased included four types of projects, one of which was: " * * * Indian lands demonstration projects, wherein lands would be acquired for use by certain Indians to improve their economic welfare and lessen relief costs among them * * *."[11] We do not read the language of Section 2 of the Act dealing with the prohibition against offsets for expenditures under emergency relief legislation as requiring that the claimant Indians receive a primary and immediate possessory interest in the subject matter of the expenditures in order for those expenditures to fall within the prohibition. The record reflects that at the time of the expenditures in question, or shortly thereafter, the Indians were an intended user or in fact used these lands. We do not deem it significant that there may not have been shown an exact simultaneity or relationship between the time of the appropriation or purchase and either the time of the expression of the intention that the purchase be for "Indian purposes" or the time of the beginning of actual beneficial use of the land by the Indians.

■ The second prong of appellant's argument is that if the Commission is correct that these lands were purchased under emergency relief legislation "with appellees in mind," then the *expenditures* were for a specific purpose, and not " * * * generally applicable throughout the United States for relief in stricken agricultural areas." The simple answer to this argument is that the Act does not require that the *expenditures* be " * * * generally applicable * * * " but rather that the *appropriation or allotment* from which the expenditure is made be " * * * gener-

11. Yearbook of Agriculture, 1936, quoted at 26 Ind.Cl.Comm. 218, 235.

ally applicable throughout the United States for relief in stricken agricultural areas." Indeed, the reading of this clause opted for by appellant would completely emasculate the prohibition against offsets of expenditures under relief measures. To reason that because the pueblos were the intended beneficiaries of the expenditures, the expenditures could not have been made under the appropriations or allotments " * * * generally applicable * * * " would have the effect of never prohibiting the offset of expenditures made under emergency appropriations (for relief in stricken agricultural areas) which are in part intended to benefit claimants such as plaintiffs in this case.

The Government seeks to support its reading of the statute by noting that Section 2 of the Act specifically provides that lands purchased under Section 5 of the Indian Reorganization Act (hereinafter I.R.A.) of June 18, 1934, 48 Stat. 984, 25 U.S.C. § 465, are to be allowed as offsets.[12] Section 5 of the I.R.A. permits the Secretary of the Interior to acquire lands, water rights, or surface rights to lands " * * * for the purpose of providing land for Indians." 25 U.S.C. § 465. The statute authorizes a separate and distinct fund to be appropriated for acquiring these lands. The Government reasons that since Section 5 of the I.R.A. involves expenditures specifically for "Indian purposes" and since Section 2 of the Indian Claims Commission Act expressly provides that expenditures under Section 5 of the I.R.A. are to be allowed as offsets, then the legislative intent must be that *any* expenditures to purchase land specifically for Indian purposes, regardless of the source of the funds, are proper offsets.

This reading of Section 2 flies in the face of the emphatic and categorical language of the statute that: " * * * expenditures under *any* emergency appropriation or allotment made subsequent to March 4, 1933, and generally applicable throughout the United States for relief in stricken agricultural areas * * * *shall not* be a proper offset against any award." [Emphasis added.] 25 U.S.C. § 70a.

Since we hold that the Commission properly excluded Items 1, 2, 3, 4, 6, 8, 10 and 13 as offsets against the principal award, we need not consider the alternative grounds upon which the Commission excluded some of these groups of land. Nor is it necessary to consider appellant's argument that these lands should have been valued at their fair market value at the time they were placed in trust since these lands were properly disallowed as offsets under a statutory exclusion, and hence the question of valuation is not reached.

*Item 14*

Section 2 of the Indian Claims Commission Act expressly provides that no offset will be allowed for monies spent for " * * * health (or) educational purposes * * * ."[13] Relying upon this exclusion the Commission held that Item 14 was an improper offset. We agree. There is substantial evidence in the record to support these findings upon which the determination is based.

Item 14 consists of 2.81 acres of land which was Santa Ana Pueblo fee title land when condemned by the Government in 1920 for school purposes. A school was built thereon and used as such until abandoned as a school by the United States in July 1960. From this date until June 1965 the site was used as a meeting place for the tribal council, and for other community gatherings. During this time a portion of the site was also used by the Public Health Serv-

---

12. 25 U.S.C. § 70a provides in pertinent part:
    " * * * except that it is declared to be the policy of Congress that * * * expenditures made pursuant to sections 461, 462, 463, 464, 465, 466–470, 471–473, 474, 475, 476–478 and 479 of this title, *save expenditures made under section 465 of this title,* * * * shall not be a proper offset against any award." [Emphasis added.]

13. 25 U.S.C. § 70a.

ice. By the Act of March 7, 1966, 80 Stat. 30, the 2.81 acres of land were placed in trust by the United States for the Santa Ana Pueblo. The transfer of title to the pueblo was effective excluding mineral interests, upon publication of notice in the Federal Register on August 27, 1968, 33 Fed.Reg. 12108. The Federal Register declaration provides that the site is subject to use by the Public Health Service for health purposes so long as required. Since the transfer to Santa Ana, a headstart program for pre-school children has been operated on the premises by the pueblo and a portion of the area is still used by the Public Health Service.

The land was originally condemned for school purposes; has been used continuously for school purposes except for a hiatus during the 1960's when it was used by the Public Health Service; and now continues to be subject, in whole as well as in part, to health uses. The Commission therefore correctly found that the site is disqualified as an offset under the health and education exclusion of the Act.

*Items 5, 7, 9, 15, 16*

Items 5, 7, 9, 15, and 16 are groups of land included within the 298,634 acres regarding which this court previously ruled that the pueblos had established aboriginal title. 165 Ct.Cl. 501. These five groups of land formed part of the lands found by the Commission in its earlier decision, 19 Ind.Cl.Comm. 56, to have been taken from the pueblos by the United States through the creation of Grazing District No. 2 on April 4, 1936. Appellant does not now dispute either that these five items were aboriginally owned by plaintiff pueblos or that the United States took these lands. So

these five tracts undisputably form part of the aboriginal land on which the interlocutory award of $938,000.00 was based. We have now a novel situation where the United States in effect seeks to set off against the award for the initial taking of these groups of land the subsequent transfers in trust of the same lands back to the pueblos from whom the acreage was first taken.

The Commission found that from the time of taking to the time of transfer in trust the pueblos had lost use of Item 5 for 26 years; Items 7 and 9 each for 20 years; Item 15 for 30 years; and Item 16 for 32 years.[14] In computing the net amount of offset which the Government should be allowed for returning these aboriginal lands, the Commission reasoned that the value of the temporary loss of these lands to the pueblos should be offset against the offset sought by the Government. In other words, a counter offset was necessary.[15] The counter offset was valued using the rule of Johnson v. United States, 2 Ct.Cl. 391, 416 (1866) that when the Government takes land on a temporary basis, it is established: " * * * that the measure of the damages must be limited to the value of this temporary occupancy, as though the claimant had leased and the government had rented the premises * * *." *Johnson* sanctioned the use of calculating damages for temporary loss of use by multiplying the number of years of lost use times the annual rental value computed as some percentage of the fair market value at the time of the taking of the land. Likening the taking and then return of aboriginal land to a "temporary taking," the Commission deemed that a fair annual rental value of each of the lands in question to be

14. The Commission found that the pueblos had been deprived of the use of Item 5 from 1936 to 1963; of Items 7 and 9 each from 1936 to 1956; of Item 15 from 1936 to 1966; and of Item 16 from 1936 to 1968, 26 Ind.Cl.Comm. 218, 262.

15. This "counter offset" theory employed by the Commission is similar to an idea expressed by Judge Nichols in his con-

curring opinion in United States v. Delaware Tribe et al., 427 F.2d 1218, 1232, 192 Ct.Cl. 385, 408 (1970) where he says: "With all respect, it seems to me the language may visualize what might be called offsets against offsets, *i. e.*, that wrongs not permissibly the subject of direct claims might be considered as 'in good conscience' an insuperable objection to allowance of offsets."

five percent of the value of the land. Since the period of "temporary taking" of each group of land was 20 years or more, the total value of each of the counter offsets was 100% or more than the value of each possible respective offset. Each counter offset thus equaling or exceeding its offset, no offset was allowed for any of these five items of land.

Appellant has vigorously argued that the theory of "temporary taking" is inapplicable to this case since there was, as the Commission itself found, a clear extinguishment of Indian title to all of these five groups of land in 1936, the theory of temporary taking being appropriate only where some vestige of title remains in the claimant.

We think appellant's argument would have force had the Commission been using the theory of temporary taking initially to calculate the principal award to which appellees were entitled for the taking of these lands. However, the Commission was not employing the theory for this purpose. To reconcile the equities involved and to find consistently with the spirit of the Act, the Commission adopted the theory of temporary taking and counter offsets to deal with the wholly unique situation presented by a claimed offset consisting of aboriginal lands. The Commission used the theory of temporary taking not to calculate in the first instance the award of damages to which the pueblos were entitled, but rather to evaluate the offset itself.[16] Underlying this admittedly unique treatment of offsets was the Commission's belief that it is inequitable and contrary to the spirit of the Act to allow the award for taking of aboriginal land to

be diminished by credit for returning the same land where the value of the temporary deprivation of use and enjoyment of the land exceeded the value of the land at the time of the taking.[17] Especially unfair in the Commission's view would be to allow the Government to take the aboriginal land, deprive the owners of use, and then return the land claiming as offset the appreciated value of the land as of the time of the transfer in trust and not the value as of the time of the original misfeasance of taking without compensation.[18]

At the heart of the matter the Commission was seeking to avoid the absurd result of permitting the Government virtually free use of Indian lands for periods varying from 20 to 32 years. This result would have obtained because these five offsets sought by the Government would have canceled out the award for the initial taking of these same lands under any of the valuation theories advanced in this case.

■ The Government has repeatedly argued that the proper basis for valuation of all contested offsets in this case is the fair market value at the time of the gratuity rather than the "funds expended," *i. e.*, purchase price, for the individual land offsets. In this case, the Commission valued each of these five land offsets at neither the purchase price of the offset nor at its fair market value at the time of the gratuity. In effect, the Commission valued the offsets at the fair market value at the time of the taking. Thus, there was in fact used a valuation method different from either that which the Commission claimed it would use (21 Ind.Cl.Comm.

16. Had this temporary taking theory been given its normal use, then the appellees would have been entitled to additional damages in the amount of the excess by which the value of the temporary loss of use exceeded the value of the offset. Clearly this could not be done in this case because it would have given the appellees a double recovery.

17. 26 Ind.Cl.Comm. 218, 236–237.

18. The Commission's thinking is reflected in 26 Ind.Cl.Comm. at 233:
"* * * Much of the land for which offsets are requested was part of the Indians' aboriginal territory on which the award was based. We thus have the anomaly of the Government returning, after a period of years, a portion of the land taken, and claiming as an offset an amount greater than the award because of land appreciation during the interim."

316, 319), and different from that method argued for by appellant. With respect to the unique situation presented by a claim for offsets of aboriginal land, the valuation method chosen by the Commission is consistent with the Indian Claims Commission Act. As we have said before in Ponca Tribe v. United States, 183 Ct.Cl. 673, 689 (1968): "* * * the gratuity provisions, by allowing offsets for *either* 'property given * * * or funds expended' present the court with a choice between applying the purchase price of property (the funds expended) or its value as of a given date in reduction of the claim." The Act does not specify that "property given" be valued without exception as of the date of the gratuity. The burden is on appellant to demonstrate that the determination of the Commission is arbitrary. United States v. Assiniboine Tribes, 428 F.2d 1324, 1333, 192 Ct.Cl. 679, 696 (1970). That burden has not been met.

Appellant has argued that our decision in Kickapoo Tribe v. United States, 372 F.2d 980, 985, 178 Ct.Cl. 527, 534–535 (1967), favors permitting the Government these offsets valued at their fair market value at the time of the transfers in trust of these lands to the pueblos. Under the facts of this case nothing in *Kickapoo* favors such a result.

The repeated and moving pleas of Indians [19] to be compensated for the taking of their lands was an inducement to providing a systematic method of settling, once and for all, Indian land claims accrued before 1946. The legislation which, with amendments, was finally enacted to provide such relief was "* * * primarily designed to right a continuing wrong to all Indian citizens for which no possible justification can be asserted."[20]

The discretion to be given the proposed Indian Claims Commission in passing upon offsets was the subject of Congressional disagreement. The House of Representatives' version of H.R. 4497, which was one in a series of bills [21] providing for an Indian Claims Commission and which, with amendments, ultimately became law, provided in Section 2 in part that:[22]

* * * In determining the quantum of relief the Commission shall

19. For example, in the Congressional debates on H.R. 4497, Senator Karl Mundt of South Dakota said this: "I have nothing more to say for myself, but before I conclude I want to give you the words of a group of old Indian chiefs who, twenty-odd years ago, said what shines through the years with the clarity that simple truths contain: 'We have also been told that you have said that our claim is too large. We have never put any price on our lands, or on the rights you took away from us without our consent. All we have asked, all we now ask is that the matter be settled; that you permit your Court of Claims to decide whatever it is just for you to pay us. Are you not willing to pay that; are you not willing to pay whatever you justly owe; whether it is big or little? We are told that you are the head of the wealthiest Nation in the whole world; that the United States is a benevolent Nation, that has given hundreds of thousands of dollars —great sums that the poor Indian cannot comprehend—to the poor people across the ocean in the countries where the great World War was fought, and where our own sons fought, bled, and died, fighting shoulder to shoulder with your own sons. Whatever your courts may decide and fix upon as the amount justly due us for the lands and rights taken from us will be as but a leaf from the great tree of your wealth; it will be but as a small twig from the branch that you broke off and gave away. Is not the heart that gives away big enough to move you to pay the just debt, be it little or big, that you owe to us poor Indians?

"An Indian pays his debts before he gives a potlatch.'" 92 Cong.Rec. 5317 (1946).

20. H.R.Rep. No. 1466, 79th Cong., 2d Sess., 1 (1946).

21. See Judge Littleton's exhaustive study of the legislative history of the Act in Otoe and Missouria Tribe v. United States, 131 F.Supp. 265, 131 Ct.Cl. 593, cert denied, 350 U.S. 848, 76 S.Ct. 82, 100 L.Ed. 755 (1955).

22. H.R. 4497, 79th Cong., 2d Sess., 92 Cong.Rec. 5320, 5321 (1946).

make appropriate deductions for all payments made by the United States on the claim, and for all other offsets, counterclaims, and demands that would be allowable in a suit brought in the Court of Claims under section 145 of the Judicial Code (36 Stat. 1136; 28 U.S.C. § 250), as amended. Where the Commission determines that the claimant is entitled to relief, in whole or in part, solely on the grounds specified in clause (6) of the first paragraph of this section, it *shall* inquire into all expenditures or grants of money or property, including gratuities, made by the United States for the benefit of the claimant, and *shall* make such deductions on account thereof, in addition to the deductions required by the preceding sentence, as it finds the entire course of dealings and accounts between the United States and the claimant in good conscience warrants. [Emphasis added.]

Clause (6) of the first paragraph of Section 2 of the bill relates to "claims of whatever nature which would arise on a basis of fair and honorable dealings, even though not recognized by any existing rule of law or equity."[23] Thus, the House version of H.R. 4497 provided that an offset for gratuities "shall" be considered only in claims based upon "fair and honorable dealings."

The Senate struck from H.R. 4497 the above-quoted House language governing offsets and substituted in lieu thereof the following:

Whenever the Commission shall determine that a claimant is entitled to relief it *shall* inquire into and consider all counterclaims and setoffs and demands that would be allowable in a suit brought in the Court of Claims under section 145 of the Judicial Code (36 Stat. 1136, 28 U.S.C. § 250), as amended; and it *may* also give weight to all money or property given to or funds expended gratuitously for the benefit of the claimant. [Emphasis added.][24]

In drafting the proposed amendment the Senate Committee on Indian Affairs rejected an amendment to H.R. 4497 proposed by then Attorney General Tom Clark which captured language declaratory of policy included within the General Appropriations Act of August 12, 1935.[25] The rejected amendment read:

Whenever the Commission shall determine that a claimant is entitled to relief it *shall* inquire into and consider all counterclaims and set-offs and demands that would be allowable in a suit brought in the Court of Claims under section 145 of the Judicial Code (36 Stat. 1136, 28 U.S.C. § 250), as amended, as well as all money or property given to or funds expended gratuitously for the benefit of the claimant. [Emphasis added.][26]

The Houses of Congress could not agree upon the Senate amendment, and a conference was agreed upon. The conference produced the compromise language, now the law governing offsets.[27] It is important to note that the present law reflects not the hortatory language of the House version of H.R. 4497 that the Commission " * * * *shall* inquire into all expenditures or grants of money or property, including gratuities, made by the United States for the benefit of the claimant, and *shall* make such deduc-

---

23. *Ibid.*

24. S.Rep. No. 1715, 79th Cong., 2d Sess., 1, 2 (1946).

25. In the Act of August 12, 1935 (49 Stat. 571, 596) in Title I, Section 2, Congress declared as a matter of policy:
    "In all suits now pending in the Court of Claims by an Indian tribe or band which have not been tried or submitted, and in any suit hereafter filed in the Court of Claims by any such tribe or band, the Court of Claims is hereby *directed to consider and to offset* against any amount found due the said tribe or band all sums expended gratuitously by the United States for the benefit of the said tribe or band * * *." [Emphasis added.]

26. Footnote 24, *supra*, at 8.

27. 25 U.S.C. § 70a.

tion on account thereof * * *" [Emphasis added], but rather reflects the more discretionary language of the Senate version which provided that the Commission "may" make such inquiries and deductions, having satisfied itself that the nature of the claim and course of dealings and accounts in good conscience so warrants.

The House managers of the conference viewed the compromise language as follows:

> The bill as originally passed by the House also required deduction of legal offsets in all cases and permitted, in the discretion of the Commission, deduction of gratuities in cases based upon "fair and honorable dealings." The Senate amendment made all types of deductions wholly discretionary with the Commission.

> The conferees agreed that the Senate amendment gave too broad a discretion to the Commission and accordingly rewrote the section to require, first, that all deductions generally allowable in the Court of Claims against non-Indian claimants shall be allowed by the Commission in cases heard under this act, and, secondly, that gratuities of certain specified types, which are not allowable in the Court of Claims against non-Indian claimants, shall not be allowed by the Commission under this act against Indian claimants. The effect of the substitute language is to limit the discretionary authority of the Commission and to remove in large part the possible discrimination against Indian claimants in the matter of gratuities. * * * [28]

In the House conferees' view, the Senate amendment gave complete and unchecked discretion to the Commission to allow or disallow all types of offsets. In cutting back upon this untrammeled discretion, however, the conferees still left latitude for the discretion of the Commission in considering and deducting gratuities as offsets. The House conferees noted that: "In no other field of law, known to your conferees, is a defendant permitted to set off against a valid judgment a gratuity given to the plaintiff."[29] The conferees were therefore attentive to enacting language permitting the Commission to avoid results at variance with the purposes of the Act.

■ We think the Commission was right, and acting within its discretion, when it disallowed the claimed offsets of aboriginal lands using a theory of temporary taking. We cannot say that in the exercise of its discretion the Commission erred in this limited use of the theory of temporary taking in valuing and finding inappropriate these five claimed offsets of aboriginal land.

■ We are mindful that "the Act clearly authorizes the Commission to allow eligible gratuities as offsets against any award." United States v. Delaware Tribe et al., 427 F.2d 1218, 1221, 192 Ct.Cl. 385, 390 (1970). And we are not disagreeing with our holding in Red Lake, Pembina & White Earth Bands v. United States, 164 Ct.Cl. 389, 396 (1964), when we said:

> [U]nder the Act, "gratuities" can be deducted from awards. Congress so enacted the law, and we can hardly say that in creating and vesting in the Indians a right to relief, Congress could not impose conditions and limits on the award of that relief.

We are saying, however, that we agree, and it is within the discretion of the Commission to determine, that these claimed offsets should not be allowed so as to produce an absurd result at variance with the intent of Congress. We noted in Assiniboine, supra, 428 F.2d at 1333, 192 Ct.Cl. at 696, that Section 2 of the Act:

> * * * permits the Commission to exercise a certain amount of discretion in determining whether gratu-

---

28. H.Rep.No.2693, 79th Cong., 2d Sess., 6, 7 (1946).

29. Id. at 7.

itous payments should be offset against awards made to Indian tribes. As long as the Commission does not abuse this discretion by arbitrarily refusing to allow gratuitous offsets without considering the nature of the claim and the course of dealings between the parties, then this court should not interfere with such a determination.

We are not dealing here with an inflexible rule applied across the board by the Commission such as was true in *Delaware, supra.*

█ Appellant has argued that the Commission "waived any further discretion to deny legally proper offsets by its finding, as a fact, that the entire course of dealings between the United States and appellees was such as in good conscience to warrant the allowance of all legally proper offsets to appellant." The actual determination of the Commission was worded as follows:

Section 2 of the Indian Claims Commission Act (60 Stat. 1049, 1050) permits the consideration of gratuitous expenditures as offsets if the entire course of dealings and accounts between the United States and the Indians in good conscience warrants such action. We are satisfied that the course of dealings between the plaintiffs and the defendant has not been such that the United States is prohibited from receiving credit for such gratuitous offsets as may be allowable. 26 Ind.Cl.Comm. 218, 222.

This language of the Commission is found in its remarks prefatory to considering on a subject matter group-by-group basis the various claimed offsets of the Government. The language is in the negative and is not an affirmative assertion, as appellant contends, that all offsets will be allowed which do not fall

under some express prohibited category of expenditures under Section 2 of the Act. We read this determination of the Commission to say no more than having considered the entire course of dealings and accounts between the United States and plaintiff pueblos, the Commission was satisfied that the course of dealings and accounts did not warrant a blanket exclusion of all claimed offsets. The offset provision of the Act clearly contemplates instances in which all gratuities may be disallowed on an overall basis and other instances in which certain classes of gratuities can be rejected for reasons pertaining either to the nature of the claim or the history of the dealings and accounts.[30] The Commission was doing no more than announcing that it had found no reason in good conscience for a dragnet exclusion of all gratuities. This determination did not preclude it from excluding selected classes of gratuities, such as claimed offsets of aboriginal lands, for reasons unique to the class.

Moreover, the Commission in this prefatory remark did not address itself to the "nature of the claim." In this case the nature of the claim, *e. g.,* a claim for compensation for the taking of aboriginal lands with a countervailing claimed offset of the same aboriginal lands, is the nexus for the disallowance.

Since we hold that these five groups of land were properly disallowed, we need not reach the question of alleged errors in alternative grounds upon which the Commission denied some or all of these claimed offsets.

*Item 11*

Item 11 produced the only land offset permitted by the Commission in this case. Item 11 is aboriginal land which the Commission found taken by appellant through the creation of Taylor

---

30. " * * * The Commission may also inquire into and consider all money or property given to or funds expended gratuitously for the benefit of the claimant and if it finds that the nature of the claim and the entire course of dealings and accounts between the United States and the claimant in good conscience warrants such action, may set off *all or part* of such expenditures against any award made to the claimant * * *." [Emphasis added.] 25 U.S.C. § 70a.

Grazing District No. 2 in 1936. 24 Ind. Cl.Comm. 270, 284. The Commission further found that Item 11 was returned to the appellees' use and enjoyment in 1939 although the land was not transferred in trust to the pueblos until passage of the Act of September 14, 1961, 75 Stat. 500. 26 Ind.Cl.Comm. at 258, 259. Again treating this interruption of use and enjoyment as a temporary taking, the Commission determined that appellant was entitled, after a counter-offset adjustment for the loss of use and enjoyment for three years, to a net offset of $118,596.00. 26 Ind.Cl.Comm. at 259. Appellant does not argue that the evidence in the record does not support the land values computed by the Commission. Rather, appellant objects to the valuation method of "temporary taking" used by the Commission. What we have said above with regard to the good-conscience discretion of the Commission in the treatment of claimed offsets of aboriginal lands applies here. The use of this valuation method is not contrary either to *Ponca, supra,* or *Kickapoo, supra,* neither of which dealt with the species of offset claimed by the Government in Item 11.

We similarly dispose of appellant's argument that Item 11 should be valued as of the date of the gratuitous transfer in trust on the same grounds as we advanced above, with respect to Items 5, 7, 9, 15, and 16.[31]

*Item 12*

Item 12 represents 3,520 acres of land which was purchased by the United States from Mexico in 1848, and was outside appellees' aboriginal area. 26 Ind.Cl.Comm. at 259. No Indian title to it was extinguished when it was placed in trust for the pueblos under the Act of September 14, 1961, 75 Stat. 500. It was land which was in all respects a new donation.

As a foundation for its disqualification of Item 12 because appellant failed to introduce evidence of any "expenditure" for this land, 26 Ind.Cl.Comm. at 239, the Commission had preliminarily decided that all offsets were to be valued according to the "funds expended," *e. g.,* purchase price, for the land rather than according to the "property given," *e. g.,* fair market value as of some date.

The Government has argued that in the decision of September 15, 1971, 26 Ind.Cl.Comm. 218, the Commission erroneously suggested that it "has no discretion to allow the fair market value of 'property given' as an offset,"[32] and for this reason refused to consider the fair market values at the times of the transfers in trust of the claimed gratuities. We do not so read the opinion of the Commission. The Commission considered only the "expenditure basis" of the offsets because it had formerly ruled in 21 Ind.Cl.Comm. 316, that this valuation method was the law of this case. The Commission did not suggest that this valuation method is compelled in *every* case.

In support of the uniform rule of "funds expended" which the Commission intended to apply across the board to all claimed land offsets in this case, the Commission offered this rationale:

The soundness of this principle is illustrated in the present case. Here some aboriginal title lands taken from the Indians in 1936 were returned in 1961. Presumably if the more recent market value were to be offset, the Indians might be said to owe the United States some balance for having their lands taken from their control for some years. We do not think Congress intended such a result under the statutory language " * * * may set off all or part of such *expenditures* against any award * * *." (25

31. It is not controlling that the Commission deemed its allowance of $118,596.00 for Item 11 as an "expenditure," (26 Ind.Cl. Comm. 218, 238) which it was allowing as an offset. We think it more appro-

priate that it should be considered an offset of "property given" valued as of the date of the taking of this aboriginal land.

32. Appellant's brief at page 33.

U.S.C. § 70a) [Emphasis added.] We cannot countenance a reading of the Act that would allow the Government to take lands from the Indians, hold them for appreciation, and avoid liability for the taking by a return of a fraction of what was taken. See Citizens Band of Potawatomi v. United States, 19 Ind.Cl.Comm. 368 (1968). [21 Ind.Cl.Comm. 316, 319.]

We need not pass upon the propriety of this blanket rule for valuing offsets in this case since the issue is not reached. While the rationale supporting this rule may apply to other offsets, it is abundantly clear that it in no way supports valuing Item 12 on the basis of "funds expended" rather than the "property given." Item 12 was not aboriginal land.

The failure of the Government to introduce evidence of an "expenditure" for Item 12 is fatal only if the rationale for valuing this item on a "funds expended" basis has application to the item. When the Commission concluded that as a matter of law the proper basis for valuing Item 12 was the "funds expended," it thereby applied a valuation criterion to this item for a reason wholly alien to this item, namely, that aboriginal land was involved.

■ The statute giving this court jurisdiction to review final determinations of the Commission directs us to ascertain whether " * * * the conclusions of law * * * are valid and supported by the Commission's findings of fact." 25 U.S.C. § 70s. The fact that Item 12 is not aboriginal land is wholly at variance with the reason supporting the conclusion that the proper method of valuation for this item is the "funds expended" for the property.

We do not intimate whether or not Item 12 should, upon remand, be valued at "funds expended" or "property given." Regardless of the method selected by the Commission, however, both parties should be given the opportunity to introduce relevant evidence as to value.

## II. THE "CASH" GRATUITIES

The Commission refused to allow as offsets expenditures (1) for certain farm vehicles and (2) for licenses purchased on behalf of appellees to permit them to graze cattle on Government lands. The amounts involved are $191.-61 and $252.33, respectively, which appellant deems "small in amount but important in legal principle."

■ The vehicles involved are five wagons purchased in 1915 for 19 pueblos, and one tractor purchased in 1928 for eight pueblos. Although agreeing with the general principle that it is appropriate to offset a proportionate share of expenditures against plaintiffs where the goods are such as could be ratably apportioned, the Commission found that the pueblos were widely dispersed, and that the vehicles could not be reasonably apportioned. 26 Ind.Cl.Comm. at 226, 227. We agree. There could be no reasonable apportionment of expenditures for these few vehicles which could not be reasonably utilized by so many pueblos over such a widely scattered area. Substantial evidence supports the Commission's finding and determination.

■ The Commission disallowed the expenditure of $252.33 for the rental of grazing land on behalf of appellees for two reasons. First, appellant-defendant had offered only one voucher in the amount of $45.57 in payment for a cattle-grazing license for the Zia Pueblo as evidence of the full $252.33 claimed. 26 Ind.Cl.Comm. at 228, 229. Second, the $45.57 was actually a check drawn on Indian Service funds payable to the Treasurer of the United States for the General Land Office, Santa Fe, New Mexico. In short, the expenditure " * * * was a mere bookkeeping transaction * * * a transfer of Government funds from one account to another." 26 Ind.Cl.Comm. at 218, 229. We do not agree that the expenditure was " * * * a mere bookkeeping transaction," and therefore disallowable. The expenditure is rather one which clearly

falls within permissible gratuitous offsets as a constructive payment. Pawnee Tribe v. United States, 157 Ct.Cl. 134, 140 (1962). Since the Commission did not suggest that the expenditure did not benefit the Zia community, appellant is entitled to an offset to the extent proven, namely, $45.57.

We otherwise find no consistent pattern of errors of law and fact demonstrating an abuse of discretion requiring reversal.

The final judgment and order of the Indian Claims Commission is affirmed in part and reversed in part, and the cause remanded to the extent necessary and consistent with this opinion.

Affirmed in part, reversed in part and remanded.